**MINPECO, S.A., Plaintiff,**

v.

**Nelson Bunker HUNT, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., Advicorp Advisory and Financial Corporation, S.A., and Mahmoud Fustok, Defendants.**

**No. 81 Civ. 7619.**

United States District Court,
S.D. New York.

May 12, 1988.

Cole Corette & Abrutyn, Washington, D.C. (Mark A. Cymrot, Thomas O. Gorman, Pedro R. Pierluisi, of counsel), Grand & Ostrow, New York City, for plaintiff Minpeco, S.A.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Aaron Rubinstein, Paul J. Curran, Stanley D. Robinson, Michael Malina, David S. Copeland, of counsel), Gardere & Wynne, Dallas, Tex. (Robert E. Wolin, of counsel), for defendants Nelson Bunker Hunt, William Herbert Hunt and Lamar Hunt.

Curtis, Mallet–Provost, Colt & Mosle, New York City (Herbert Stoller, Turner P. Smith, of counsel), for defendant Mahmoud Fustok.

Laxalt, Washington, Perito & Dubuc, Washington, D.C. (Paul L. Perito, of counsel), for defendant Intern. Metals Inv. Co., Ltd.

Debevoise & Plimpton, New York City (Andrew C. Hartzell, Jr., Standish F. Medina, Jr., Michael E. Wiles, Timothy J. Toohey, of counsel), for ACLI Intern. Commodity Services, Inc.

LASKER, District Judge.

Plaintiff Minpeco S.A. ("Minpeco") moved for partial summary judgment on defendants' "single entity" theory on January 4, 1988. The motion was granted prior to the commencement of trial in this action on February 18, 1988. This opinion sets forth the grounds for that decision.

Defendants' "single entity" theory alleges that Peru's mining sector was a single entity or enterprise controlled by the Government of Peru from "cradle to grave":

> Minpeco in 1979 and 1980 was a creature of the Revolutionary Government's takeover of the entire mining sector in 1971, a takeover which led to Peru's total dominion over all aspects of the production, marketing and refining of the nation's minerals, including silver.[1]

1. Defendants' Memorandum in Opposition to Minpeco's Motion for Partial Summary Judgment On Defendants' Single Enterprise Theory at 19–20 (Jan. 25, 1988).

Hence, defendants argue that "Minpeco is obligated to include in its calculation of the required offset the benefits that accrued to the Government of Peru by virtue of the physical silver holdings of all Peru-owned and -controlled entities." [2]

The facts concerning the structure of Peru's mining sector and Minpeco's corporate structure in 1979–1980 are not in dispute. The State of Peru owns Peru's natural resources, including its mining fields. Peru assigns the right to exploit its mining fields to individuals and companies, both state-owned and private, which then have legal title to the minerals which they extract from the fields. In 1979–1980, Empresa Minera del Centro del Peru ("Centromin"), a stock corporation wholly owned by Minero Peru, a state-owned mining company, produced about half of Peru's silver in the form of silver bullion. Private miners produced the balance in the form of lead minerals and concentrates.

Minpeco is a state-owned corporation established in 1974 to engage in the trading of Peruvian mining products. In 1979–1980, Minpeco had the exclusive right and obligation to trade Centromin's and the private miners' silver production. Minpeco's articles of incorporation define it as a "public enterprise, as a juridical person of public internal law, with administrative, economic and technical autonomy." Minpeco has the legal right to have its own capital, to sue and be sued, to hold property in its own name and to contract in its own name.

Peru's central bank, Banco Central de Reserva del Peru ("BCR"), is a state-owned corporation that issues currency, regulates credit, administers exchange rates and maintains reserves. In 1979–1980 the BCR kept silver bullion as part of its reserves, either in its vaults or loaned to other entities.

The "single entity" defense was first raised in this action in 1982, when defendants moved for a separate trial on the issue of damages. Defendants argued that Minpeco is "an 'arm' of the Peruvian government, and therefore cannot recover damages for losses caused by a rise in the price of silver, because the Peruvian government as a whole benefitted from the rise in price." *Minpeco S.A. v. ContiCommodity Services, Inc.*, 549 F.Supp. 857, 858 (S.D.N.Y.1982). The motion was denied because defendants offered "no factual basis for disputing Minpeco's assertion that it is a corporation, a separate legal entity, organized validly and in good faith ...," *id.* at 858, but defendants were held to be "free to attempt to develop and put before the Court evidence, if any, that Peru and Minpeco have engaged in conduct which justify disregarding Minpeco's corporate existence," *id.* at 859.

After five years of extensive discovery on this issue, defendants assert that they have developed "substantial evidence establishing that Minpeco and the other entities in the Peruvian mining sector constitute a single enterprise," [3] sufficient that a jury could reasonably find for defendants on this issue. Minpeco responds that the evidence of record is insufficient as a matter of law to overcome the presumption established by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2600, 77 L.Ed.2d 46 (1983) (*"Bancec"*), that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."

Drawing all justifiable inferences in favor of defendants, I still conclude that defendants have failed to make a sufficient demonstration that either Minpeco or Peru has engaged in conduct which could overcome the *Bancec* threshold presumption in favor of honoring the separate legal status of a government corporation. Because there is insufficient evidence of record to allow a reasonable jury to find for defendants on the single entity defense, the motion for partial summary judgment under Fed.R.Civ.P. 56 is granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

---

**2.** *Id.* at 2–3.

**3.** Defendants' Memorandum in Opposition at 2.

## I.

*First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*), sets forth the legal framework for decision on this motion. The *Bancec* court considered whether a claim asserted against Citibank in the United States federal courts by Bancec, a foreign trading bank created and wholly owned by the government of Cuba but established as a separate juridical entity, could be subject to a set-off for Citibank's counterclaim against Cuba. In 1960 the Cuban Government had nationalized through forced expropriation the Cuban properties of United States citizens, including properties owned by Citibank. In 1961 Bancec sued in the Southern District of New York to recover on a letter of credit established by Citibank in a transaction for the sale of sugar. The Cuban Government then dissolved Bancec and transferred its assets, first to several government agencies which had been involved in the 1960 nationalizations, and later to several government corporations. After Bancec's dissolution, Citibank counterclaimed in the Bancec action, seeking a set-off on the letter of credit for the value of its seized assets in Cuba.

In determining whether Citibank was entitled to a set-off, the *Bancec* court described the characteristics and growing importance, especially in developing countries, of government instrumentalities established as separate juridical entities:

> Increasingly during this century, governments throughout the world have established separately constituted legal entities to perform a variety of tasks. The organization and control of these entities vary considerably, but many possess a number of common features. A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the power to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

> These distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies. These same features prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.

462 U.S. at 624–25, 103 S.Ct. at 2598–99 (footnotes omitted).

Consideration for the political and economic importance of the government instrumentality as an instrument for development led the Court to establish a presumption in favor of honoring a foreign government's determination that its instrumentality is to be accorded separate legal status:

> Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee. As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated. Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude ... that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.

*Id.* at 626, 103 S.Ct. at 2600 (citation omitted).

The Court also concluded, however, that the favorable presumption can be overcome, noting that:

> [i]n discussing the legal status of *private* corporations, courts in the United States and abroad, have recognized that an incorporated entity ... is not to be regarded as legally separate from its owners in all circumstances. Thus, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other. In addition, our cases have long recognized "the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be disregarded when to do so would work fraud or injustice.

462 U.S. at 628–29, 103 S.Ct. at 2601 (citations omitted) (emphasis in original).

The Court concluded that the presumption of separateness should be set aside on equitable grounds in Bancec's case. The Court noted that Bancec itself had been dissolved and its assets distributed to government agencies which had played a direct role in the expropriation of Citibank's assets:

> Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held ... to have violated international law.

We decline to adhere blindly to the corporate form where doing so would cause such an injustice.

*Id.* at 632, 103 S.Ct. at 2603 (citation omitted).

In sum, *Bancec* establishes two propositions. First: there is a strong presumption that a government instrumentality is legally separate from its government owner. *See Hercaire International, Inc. v. Argentina,* 821 F.2d 559, 565 (11th Cir. 1987) (*Bancec* "presumption of independent status is not to be lightly overcome"); *Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir.1984) ("*Bancec* ... caution[s] against too easily overcoming the presumption of separateness"), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). Second: the presumption may be overcome where necessary to avoid fraud or injustice. The decision also advises by analogy to the domestic law of private corporations that separate status will also be disregarded in the case of abuse of corporate form such that "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *See Letelier,* 748 F.2d at 794 (quoting from *Bancec,* 462 U.S. at 629, 103 S.Ct. at 2601); *accord, Hercaire,* 821 F.2d at 565. It is noted that neither party has pointed to nor has this court found any case following *Bancec* in which the presumption of separateness has been determined to be overcome.

## II.

This legal framework must now be applied to the present case.[4] According to defendants, the evidence of record is sufficient to allow a reasonable jury to conclude that in Minpeco's case the *Bancec* pre-

---

4. This decision will not separately address the argument raised by ACLI International Commodity Services, Inc. in its Additional Memorandum of Defendant ACLI International Commodity Services, Inc., In Opposition to Minpeco's Summary Judgment Motion on the Single Entity Theory at 1–2, that "quite apart from traditional standards for disregarding the corporate form, profits and losses must be offset here because Minpeco and the government-owned mining companies were operating units of a single tripartite enterprise headed by the government, and for which Minpeco (whether regarded or not regarded as a separate corporation) served as the marketing agent." It is noted that "[t]he test for determining whether a corporation is acting as an agent for a related corporation is the same as the test imposed under the doctrine of piercing the corporate veil." *Kashfi v. Phibro–Salomon, Inc.,* 628 F.Supp. 727, 735 (S.D.N.Y.1986); *see also Brunswick Corp. v. Waxman,* 459 F.Supp. 1222, 1229 (E.D.N.Y. 1978) (discussing limitations of agency theory), *aff'd,* 599 F.2d 34 (2d Cir.1979).

sumption has been overcome both on the ground of fraud or injustice and on the ground of excessive control:

the record in this case is replete with evidence of Peru's total control of the state-owned corporations within the mining sector. Furthermore, the evidence reveals the injustice that would occur if Minpeco were permitted to recover damages for its "losses" in the silver market without an appropriate offset for the corresponding gains in the same market enjoyed by other elements of the Peru-dominated mining sector. In short, defendants are prepared to meet the *Bancec* standard at trial.[5]

### A.

■ In the case at hand, defendants have failed to demonstrate that there is any evidence of record which could support a finding of the kind of "injustice" that might justify overcoming the *Bancec* presumption on equitable grounds. Defendants argue that recognition of Minpeco's separate legal status would work an injustice because it would allow Peru a windfall recovery in the event of a verdict for Minpeco. The argument, however, begs the question: if Minpeco is indeed Peru's alter ego, it could be regarded as inequitable to allow Peru, through Minpeco, to recover a windfall, but the very question which must be determined on this motion is whether there is sufficient evidence of record to support such a conclusion.

In essence, defendants make the argument rejected by the Court of Appeals for this circuit in *Banco Nacional de Cuba v. Chemical Bank*, 782 F.2d 377 (2d Cir.1986). In that case, decided after the *Bancec* ruling, the Second Circuit declined to modify its earlier decision to deny an American bank a set-off on a claim against it by Banco Nacional, Cuba's state-owned national bank, even though the Cuban government had expropriated assets in which the American bank had an interest. The court rejected defendant's argument that denial of the setoff was "unfair" merely because,

*inter alia*, "Banco Nacional is an instrumentality of the Cuban government" and "Banco Nacional's success in collecting the balance in its account from [the American bank] will therefore inure to the benefit of the Cuban government," concluding that "[t]hese facts can hardly suffice to require deviation from the normal rule." 782 F.2d at 380. Similarly, defendants' argument here that it would be unfair to recognize Minpeco's separate status because a recovery by Minpeco would constitute a windfall for Peru is by itself legally insufficient to overcome the *Bancec* presumption.

### B.

Defendants' claim that the *Bancec* presumption should be set aside because of "Peru's total control of the state-owned corporations within the mining sector"[6] requires greater consideration. To determine whether Minpeco "is so extensively controlled by its owner that a relationship of principal and agent is created," *Bancec*, 462 U.S. at 629, 103 S.Ct. at 2601, decisions governing the legal status of private corporations provide guidance. *See Bancec*, 462 U.S. at 628–30, 103 S.Ct. at 2601–02. In examining the evidence, however, it must also be remembered that *Bancec* holds that, for economic and political reasons, governmental instrumentalities enjoy a special status and a presumption of separateness that is unique to government corporations.

Under general principles of corporate law, before a corporation's separate identity will be disregarded:

there must be such unity of interest and ownership that the separate personalities of the corporation and individual no longer exist, and circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. The common significant factors which would justify disregarding a corporate entity have been undercapitalization, failure to observe formalities, nonpayment of divi-

---

5. Defendants' Memorandum in Opposition at 12 (Jan. 25, 1988).

6. Defendants' Memorandum in Opposition at 12.

dends, siphoning of corporate funds by dominant stockholders, nonfunctioning of other officers or directors, absence of corporate records, use of the corporation as a facade for the operations of the dominant stockholder, and use of the corporate entity in promoting injustice or fraud.

1 *Fletcher Cyclopedia of the Law of Private Corporations* § 41.30 at 428–29 (perm. ed. 1983); *accord, Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984) (similar factors relevant under New York law); *Kashfi v. Phibro-Salomon, Inc.*, 628 F.Supp. 727, 732–33 (S.D.N.Y.1986) (same); *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1365 (S.D.N.Y.1978) (same).[7]

The decision in *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir.1984), illustrates how these principles apply to government corporations. In *Letelier*, plaintiffs sought to satisfy a judgment on conspiracy charges against the Government of Chile by seizing the assets of LAN, Chile's national airline. The district court concluded that under *Bancec*, it was permissible to disregard LAN's separate legal status because 1) LAN's assets and facilities were under the direct control of Chile, which had the power to use them; 2) Chile could have

decreed LAN's dissolution and taken over property interests held in LAN's name; and 3) Chile had used LAN to facilitate the conspiracy. 748 F.2d at 794.

The Court of Appeals reversed. Although it recognized that under *Bancec*, the corporate identity of a government instrumentality could be set aside "if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice," *id.*, the facts found by the district court did not amount to

the sort of "abuse" that overcomes the presumption of separateness established by *Bancec*. Joint participation in a tort is not the "classic" abuse of corporate form to which the Supreme Court referred.... The facts that the district court "found" here do not add up to anything that resembles the abuses in the decisions cited in *Bancec*. None of these facts showed that Chile ignored LAN's separate status.... There was no finding that LAN's separate status was established to shield its owners from liability for their torts or that Chile ignored ordinary corporate formalities.

*Id.*[8]

On this motion for summary judgment, defendants must demonstrate that there is

---

**7.** Both parties primarily cite cases decided under New York law of corporations although, of course, this is a federal action involving a Peruvian corporation. The *Bancec* court considered the question of which body of law determines the effect to be given to a governmental entity's separate juridical status and concluded that "the principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies." 462 U.S. at 623, 103 S.Ct. at 2598. The *Bancec* court cited only one case to illustrate its statement that a corporation could be so dominated by its parent corporation that in essence a principal-agent relationship would develop. In that case, *Labor Board v. Deena Artware, Inc.*, 361 U.S. 398, 403–04, 80 S.Ct. 441, 443–44, 4 L.Ed.2d 400 (1960), the Supreme Court articulated the following test:

'Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of

honesty and justice.' That is not a complete catalogue. The several companies may be represented as one. Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. One company may in fact be operated as a division of another; one may be only a shell inadequately financed; the affairs of the group may be so intermingled that no distinct corporate lines are maintained. These are some, though by no means all, of the relevant considerations, as the authorities recognize. (citation omitted) (footnotes omitted).

These criteria do not differ in any material way from those in the cases cited by the parties.

**8.** The *Letelier* court also concluded that the district court had improperly "found" facts concerning LAN's status as a sanction for Chile's failure to comply with discovery. 748 F.2d at 795 n. 2. However, the Court of Appeals' decision on the *Bancec* issue was clearly an independent ground for reversal which would stand even if the facts had been properly found. *Id.* at 794–95.

sufficient evidence of record to allow a reasonable jury to find for the defendants on two propositions. First, there must be sufficient evidence to overcome the *Bancec* presumption in favor of Minpeco's separate status and allow a finding that Minpeco was the Government of Peru's alter ego. Defendants contend that under their single entity theory, Minpeco must include in its offset calculations the benefits that accrued to Peru as a result of the rise in silver prices in 1979–1980. However, the Government of Peru *per se* does not itself own any physical silver. Hence, defendants must also demonstrate sufficient evidence to overcome the *Bancec* presumption as to the two government instrumentalities which did own physical silver in 1979–1980: Centromin, the state-owned silver mining company, and Banco Central de Reserva, the central bank.[9] I conclude that, as to all three government instrumentalities, there is insufficient evidence of record to allow a reasonable jury to find that defendants have overcome the *Bancec* presumption.

### 1. *Minpeco*

■ Defendants allege that there is evidence of seven factors which raise a genuine issue for trial as to whether Minpeco was Peru's alter ego. First, defendants argue that Minpeco's overriding aim was to benefit the Peruvian economy. Defendants maintain that the evidence to the effect that Peru set up Minpeco to try to develop its mining industry and that one of Minpeco's stated goals is to benefit the Peruvian economy tends to demonstrate that Peru dominated Minpeco. This evidence, however, is irrelevant as to the issue whether the *Bancec* presumption has been overcome. As *Bancec* recognizes, the very purpose of the typical government corporation is to act as "an essential instrument of economic development in the economically backward countries which have insufficient private venture capital to develop the utilities and industries which are given priority in the national development plan." *Bancec*, 462 U.S. at 625, 103 S.Ct. at 2599 (quoting from study). It is in the very nature of a government corporation to aim to benefit the economy of its owner government.

Second, defendants contend that there is evidence that Peru intervened in major policy decisions ordinarily reserved to management. Defendants allege the following evidence supports this contention:

a) A CFTC form filled out by Minpeco on which, in answer to the question, "Does anyone control your trading?", Minpeco checked the "yes" box and gave the Ministry of Trading and Energy as the name of the trader. Minpeco also checked a box saying it was the agent of Peru and financed by Peru.[10]

b) Minpeco's long-term goals, objectives and budget are subject to final approval by one or more Peruvian ministries.

c) Minpeco had only "nominal control" over its foreign offices in that its employees abroad were accorded a form of diplomatic status and the Government of Peru had final approval over which Min-

9. Defendants argue that it is unnecessary to establish independently that the separate legal status of Centromin and BCR should be disregarded, because defendants' proof that Minpeco is Peru's agent consists in part of proof of Peru's "cradle-to-grave" mining sector, and "[o]nce that has been established, the jury may reasonably infer that *all* the state-owned corporations in the mining sector ... should be treated as a single enterprise for the purpose of determining the quantum of loss incurred by Minpeco." Defendants' Brief in Opposition at 37. However, this argument puts the cart before the horse: it would not appear to be possible for a reasonable jury to conclude that Centromin and BCR are part of such a single enterprise until it has first concluded that the corpo-

rate veil shielding these enterprises must be pierced. The distinction is not crucial, however, given the conclusion that defendants have failed to establish that there is a sufficient evidence of record to allow a reasonable jury to conclude that Peru has engaged in activity justifying the piercing of the corporate veil even as to Minpeco.

10. Exhibit 21 to Affidavit of Aaron Rubenstein in Support of Defendants' Memorandum in Opposition to Minpeco's Motion for Partial Summary Judgment on Defendants' Single Enterprise Theory ("Defendants' Exhibits"), CFTC Statement of Reporting Trader.

peco employees could travel abroad.[11] However, it is also undisputed that Minpeco's employees in foreign offices did not report to and were not in daily contact with Peru's embassy or consulates.[12]

d) Minpeco's decision to hire counsel in this case was subject to approval by the Peruvian government.[13] However, the record is clear that this approval was necessitated by a government resolution governing foreign exchange of currency, that generally required that all Peruvian companies, public and private, obtain government approval for the "[p]ayment of technical services provided from abroad by private individuals or companies." [14]

e) The Government of Peru appointed the members of Minpeco's nine-member Board of Directors, and a majority of them were government employees. However, *Bancec* points to appointment of the board of directors by the government as a *typical* feature of a government instrumentality. 462 U.S. at 624, 103 S.Ct. at 2599.

Even assuming that the evidence summarized above might reasonably be interpreted as supporting the allegation that Peru participated in Minpeco's major policy decisions, these factors have only limited legal significance. Clearly, any sole shareholder has a strong legitimate interest in the major decisions of a wholly-owned corporation. For the purposes of establishing an alter ego relationship the more significant question is whether the government exercised day-to-day control over the instrumentality's operations. *See Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 294–97, 297 (S.D.N.Y.1987) (declining to find alter ego relationship between Bank of England and temporarily nationalized bank sufficient to overcome *Bancec* pre-

sumption where plaintiffs failed to show that the Bank of England "exercised general control over the day-to-day activities of [the second bank] such that [the second bank] might be considered its agent"); *cf. Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744, 745 (S.D.N.Y.1980) (rejecting plaintiff's contention that defendant corporation would be considered the alter ego of its parent corporation for jurisdictional reasons, because "[o]nly day to day control by the parent so complete that the subsidiary is, in fact, merely a department of the parent,' will constitute the requisite control") (citation omitted).

Defendants also argue that Minpeco's allegedly inadequate recordkeeping is relevant to a determination that Minpeco was Peru's alter ego. Defendants rely on the deposition testimony of a Peruvian minister of government, Pedro–Pablo Kuczynski, who expressed the view that the financial records kept by Minpeco and other Peruvian governmental corporations were in some respects inadequate,[15] as well as testimony by Minpeco employees allegedly indicating that Minpeco kept inadequate hedging and inventory records.[16] This evidence, even drawing all inferences in favor of defendants as the non-moving parties, is simply not relevant to the alter ego issue. The proposition of "inadequate recordkeeping" as a factor for disregarding the corporate entity is significant only as evidence of a "shell" corporation which has no need for business records because it does no business and exists only as a sham. *See, e.g., Labadie Coal Co. v. Black*, 672 F.2d 92, 97–98 (D.C.Cir.1982). It is undisputed that Minpeco was and is an active, real business entity which keeps extensive corporate records of various activities, even if they may be inadequate in some respects. In

---

**11.** Defendants' Exhibit 17, Passaro Deposition at 28–31.

**12.** Exhibit 12 to Minpeco's Reply Memorandum in Support of its Motion for Partial Summary Judgment on Defendants' Single Enterprise Theory ("Minpeco Reply Exhibits"), Passaro Deposition at 31–33.

**13.** Defendants' Exhibit 22, Ministerial Resolution.

**14.** Minpeco Reply Exhibit 11, Exchange Resolution.

**15.** Defendants' Exhibit 11, Kuczynski Deposition at 58, 60.

**16.** Defendants' Exhibit 17, Passaro Deposition at 419–21.

sum, whether Minpeco kept its records in poor condition has no legal significance on this issue.

Defendants argue that Article 85 of Minpeco's Articles of Incorporation, in effect from 1975–1981, which states that Minpeco "shall be dissolved by express mandate of the law upon request of the Ministry of Commerce," [17] is a factor which supports their single entity theory. Defendants argue that Article 85 tends to show that Minpeco did not have a limited liability relationship with Peru because "[t]he ultimate means available of limiting liability available to the owner of the corporation is its liquidation." [18] It is true that *Bancec* states that for governmental corporations as well as for private ones, "[l]imited liability is the rule, not the exception." 462 U.S. at 625-26, 103 S.Ct. at 2599-2600. However, it cannot be reasonably concluded that this provision, which merely states that Minpeco, which was created by its owner Peru through passage of a statute, can only be dissolved through passage of a statute, has any *de facto* legal significance on the alter ego issue. It is also noted that the *Letelier* court declined to pierce the corporate veil despite a finding that Chile also had the power to decree LAN's dissolution. 748 F.2d at 794.

Defendants contend that the fact that Minpeco was subject to Peru's austerity regulations which required, *inter alia*, approval for foreign travel, further supports a showing of Peru's total domination over Minpeco. However, *Bancec* describes the typical governmental instrumentality as "often ... not subject to the same budgetary and personnel requirements with which government agencies must comply," 462 U.S. at 624, 103 S.Ct. at 2599, which hardly suggests that a government corporation which *is* subject to budgetary requirements is abnormal in any significant way.

Defendants argue that evidence that Minpeco's declared capital was only five to ten percent of its legal capital [19] also supports their theory because undercapitalization is a factor to be considered in disregarding corporate entity. Inadequate capitalization is considered as a factor in piercing the corporate veil because:

> [i]f a corporation is organized and carries on a business without substantial capital in such a way that the corporation is likely to have insufficient assets available to meet its debts, it is inequitable that the stockholders should set up such a flimsy organization to escape personal liability.

1 *Fletcher Cyclopedia of Corporations* § 44.1 at 528 (perm ed. 1983). In this case, it is undisputed that Minpeco always had sufficient capital to pay its creditors, even during its financial crisis of 1979–1980, that Minpeco never defaulted, and that it operated at a profit until 1979–1980. Hence, evidence of Minpeco's low capitalization is not significant to the issue at hand.

Finally, defendants argue that a 1981 change in Minpeco's legal status supports an inference that prior to 1981 Minpeco and Peru were not legally separate. It is undisputed that in 1981, Minpeco, along with all the other Peruvian government instrumentalities, was converted from a public corporation to a state-owned corporation subject to private law.[20] Minister Kuczynski testified on deposition that he agreed that the purpose of this policy was "to create a greater degree of separation between the government and entities like Minpeco." [21] However, this change in Minpeco's legal status under Peruvian law does not logically lead to a negative inference that prior to 1981 Minpeco was Peru's alter ego, nor is it of more than limited pertinence to the analysis required by *Bancec*.

In sum, it is undisputed that Peru never violated Minpeco's articles of incorporation

---

**17.** Defendants' Exhibit 23, Minpeco Articles of Incorporation, Article 85.

**18.** Defendants' Brief in Opposition at 30.

**19.** Defendants' Exhibit 17, Passaro Deposition at 289–90.

**20.** Defendants' Exhibit 29, Legislative Decree No. 216.

**21.** Defendants' Exhibit 11, Kuczynski Deposition at 106.

or by-laws and that Minpeco was not created or used by the Peruvian government to perpetrate a fraud.[22] Although defendants have pointed to evidence giving rise to the reasonable inference that Minpeco and Peru have a close relationship and that their interests are aligned, these features typify the relationship between *all* government instrumentalities and their parent governments. Such evidence, particularly in the absence of abuse, fraud or injustice, is legally insufficient to overcome the presumption of separateness set forth in *Bancec*. As in *Letelier*, defendants have made no showing that Minpeco's "separate status was established to shield its owners from liability for their torts" or that Peru "ignored ordinary corporate formalities." 748 F.2d at 794. Here, too, it is concluded that defendants have failed to demonstrate that there is sufficient evidence of record as to Minpeco's relationship with Peru that would "add up to anything that resembles the abuses in the decisions cited in *Bancec*." *Id.*

### 2. *Centromin*

Dale Furnish, defendants' expert on the single entity theory, has testified on deposition that he has "no opinion" as to whether Centromin is separate from Peru, and that he has not studied Centromin's by-laws or organic structure.[23] Defendants' only significant argument is that a jury could reasonably conclude that Centromin was Peru's alter ego on the basis of a 1983 Peruvian Supreme Court opinion voiding an arbitration agreement between Centromin and private miners on the ground that "it is not possible to distinguish, as is claimed, the stock assets of the State from the assets of its company CENTROMIN PERU."[24] However, a legal determination of the Peruvian Supreme Court, which does not depend on evidence of fraud, injustice, or even excessive intrusion by Peru in Centromin's business affairs is insufficient by itself to allow a reasonable jury to find for defendants on the single entity theory as to Centromin.

### 3. *Banco Central de Reserva*

■ Defendants have marshalled little evidence in support of their claim that the corporate veil should be pierced as to the BCR. Defendants merely point out the undisputed facts that the BCR is state-owned, that its board is largely appointed by the government, and that the BCR loaned physical silver to Minpeco in 1979–1980 and participated in a loan to Minpeco by another bank to cover Minpeco's losses due to margin payments and the costs of closing its futures positions. This evidence is insufficient to allow a reasonable conclusion under *Bancec* that Peru excessively dominated the BCR and that the BCR was Peru's alter ego.[25]

\* \* \*

In conclusion, Minpeco's motion for partial summary judgment on defendants' sin-

**22.** Defendants' Statement of Material Facts Related to Defendants' Single Enterprise Theory As to Which There Exists a Genuine Issue to Be Tried, Response to Plaintiff's Statement of Undisputed Facts at ¶¶ 10, 15.

**23.** Exhibit 4 to Minpeco's Memorandum in Support of its Motion for Partial Summary Judgment on Defendants' Single Entity Theory ("Minpeco Exhibits"), Furnish Deposition at 207–08, 256.

**24.** Defendants' Exhibit 34, Translation of Centromin Case at 13–14.

**25.** As a final note, neither party has brought to the court's attention any evidence on the financial impact of the 1979–1980 silver crisis on Centromin and BCR: whether these entities experienced net gains or losses, or, if they experienced gains due to the increase in value of their physical silver, whether this gain outweighed Minpeco's alleged losses. Each side argues that the other side bears the burden of proof on this issue. I concluded in the December 22, 1988 opinion on damages in this case that Minpeco bears the burden of proving the offset based on its own physical silver, because it bears the burden of proving damage as part of its antitrust claim. *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 676 F.Supp. 486, 490 (S.D.N.Y. 1987). Here, however, it is clearly defendants' burden to pierce the corporate veil, *see, e.g., Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978) and it is logical to conclude that it would also be defendants' burden to prove the resulting offset as a defense to Minpeco's damage claim.

gle entity theory is granted. It is so ordered.