**APEX OIL COMPANY, Plaintiff,**

v.

**Joseph DiMAURO, et al., Defendants.**

**No. 82 CIV. 1796 (KMW).**

United States District Court, S.D. New York.

Aug. 15, 1990.

John F. Hoffman, Richard J. Wiener, Ralph Berman, Cadwalader, Wickersham & Taft, New York City, for plaintiff.

Michael Lesch, Adam B. Gilbert, Karen S. Frieman, Shea & Gould, New York City, for defendants/counterclaimants Belcher Co. of N.Y. and Belcher New Jersey, Inc.

### MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiff Apex Oil Company ("Apex") moves for summary judgment dismissing the remaining counterclaims of Coastal States Marketing, Inc. ("Coastal States Marketing"), the Belcher Company of New York, Inc. and Belcher New Jersey, Inc. ("Belcher NY/NJ") [1] (which entities are referred to collectively as "Coastal/Belcher" [2]). The counterclaims, alleging com-

---

1. Belcher New Jersey, Inc. is a subsidiary of the Belcher Company of New York, Inc. See footnote 4 and page 56, *infra*.

2. I note, however, that in their submissions, counterclaimants refer to themselves simply as "Belcher." Accordingly, citations to their memoranda use that reference.

mon law fraud and violations of the Commodity Exchange Act ("CEA") are discussed in Judge Walker's thorough opinion in this case, *Apex Oil Co. v. DiMauro*, 713 F.Supp. 587, 606–607 (S.D.N.Y.1989), in which he, *inter alia*, granted summary judgment with respect to Coastal/Belcher's other counterclaims but denied summary judgment with respect to the instant counterclaims based on the existence of material factual disputes, *see id.* at 606–608.[3] I assume familiarity with the complex procedural history and facts of this protracted litigation, as well as an understanding of the commodity futures market which provides its background, all of which have been discussed in detail not only in Judge Walker's 1989 opinion but also in his earlier opinion and a subsequent Second Circuit opinion, *see Apex Oil Co. v. DiMauro*, 641 F.Supp. 1246 (S.D.N.Y.1986), *aff'd in part and rev'd in part*, 822 F.2d 246 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). For the reasons set forth below, Apex's current motion is granted in part and denied in part.

## DISCUSSION

As Judge Walker made clear in his earlier discussion of these counterclaims, to prevail under New York law on a claim of common law fraud, "a plaintiff must prove that 1) the defendant made a false representation of a material fact; 2) the defendant intended to deceive; 3) the plaintiff justifiably relied upon the misrepresentation; and 4) *the plaintiff was injured on account of such reliance*." *Apex*, 713 F.Supp. at 607 (emphasis added) (citing *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981)). Furthermore, with respect to the CEA, the Supreme Court has stated that an implied right of action exists for the benefit of those "who can prove *injury* from ... violations." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353,

392, 102 S.Ct. 1825, 1846, 72 L.Ed.2d 182 (1982) (emphasis added).

Belcher NY/NJ actually *profited* from the alleged fraudulent and manipulative activities of Apex. According to Coastal/Belcher's own figures, when losses during the relevant time period are offset by profits reaped during the same time period, Belcher NY/NJ netted $1,277,850. Coastal States Marketing lost $485,030. *See* Defendant's Exhibit ("Ex.") NQ, Ex. A to Affidavit of John Hoffman ("Hoffman Aff.") (April 18, 1990) and Hoffman Aff. at ¶¶ 3–4. Indeed, Coastal/Belcher explicitly admits that "if they are required collectively to offset gains and losses, the Belcher Counterclaimants, as a group, will have no damages." Belcher's Response to Apex's Statement Pursuant to Local Rule 3(g) at ¶ 1. Coastal/Belcher argues that each counterclaimant should be able to recover for each of its losses, without offsetting those losses against its gains,[4] relying on *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). Coastal/Belcher argues further that, even if offset is required, it would be an inappropriate "piercing of the corporate veil" to offset Coastal States Marketing's losses with the collective profits of Belcher NY/NJ.

### A. *Offsetting Gains and Losses Within Each Entity*

■ In *Loftsgaarden*, the Supreme Court held that the recovery available to a defrauded tax shelter investor, entitled under § 12(2) of the Securities Act of 1933 or § 10(b) of the Securities Exchange Act of 1934 to rescind the fraudulent transaction or obtain rescissionary damages, did not have to be reduced by any tax benefits the investor had received from the tax shelter investment. While noting that § 28(a) of the Securities Exchange Act of 1934 limits recovery in a private damages action to " ' "actual damages," ' " *id.* at 663, 106 S.Ct. at 3153 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975)), the

---

**3.** This case was assigned to me shortly after Judge Walker ascended to the Second Circuit. At a pretrial conference held May 9, 1990, I granted Apex permission to move again for summary judgment on the remaining counterclaims based on new evidence provided by Coastal/Belcher regarding the latter's damages.

**4.** I note, however, that all calculations for the Belcher Company of New York, Inc. and Belcher New Jersey, Inc. were done collectively. Accordingly, for purposes of this motion, those two entities are treated as one.

Court also explained that, pursuant to the holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), " 'where the defendant received more than the seller's actual loss ... damages are the amount of the defendant's profit,' " 478 U.S. at 663, 106 S.Ct. at 3153 (quoting *Affiliated Ute Citizens*, 406 U.S. at 155, 92 S.Ct. at 1473). The *Loftsgaarden* Court explained the rationale of the "alternative" damages principle articulated in *Affiliated Ute Citizens*:

This alternative standard aims at preventing the unjust enrichment of a fraudulent buyer, and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud. Indeed, the accepted rationale underlying this alternative is simply that '[i]t is more appropriate to give the defrauded party the benefit even of windfalls *than to let the fraudulent party keep them.*' Thus, the mere fact that the receipt of tax benefits, plus a full recovery under a rescissory measure of damages, may place a § 10(b) plaintiff in a better position than he would have been in absent the fraud, does not establish that the flexible limits of § 28(a) have been exceeded.

....

... Congress' aim in enacting the 1934 Act was not confined solely to compensating defrauded investors. Congress intended to deter fraud and manipulative practices.... This deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their 'net economic loss.' The effect of allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors.

478 U.S. at 663, 106 S.Ct. at 3153 (citations omitted) (emphasis added).

Belcher NY/NJ and Coastal States Marketing argue in this case that forcing each of them to offset its own gains against its losses would shield Apex from appreciable liability, unjustly enrich Apex and impair the deterrent value of private rights of action.

Apex, arguing that offset is required, relies on *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F.Supp. 486 (S.D.N.Y. 1987). In that case, in which plaintiff claimed damages for losses sustained in the silver futures market, Judge Lasker held that "Minpeco's claimed damages on its silver futures positions must be offset by the measure of the increase in value which accrued to its own physical silver holdings...." *Id.* at 490.

The court in *Minpeco* noted that "[d]efendant's 'offset' argument has considerable force. Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall." *Id.* at 488. While the court rejected defendant's further argument that the Supreme Court's *Loftsgaarden* holding should be construed narrowly, stating that "*Loftsgaarden* may be fairly read as supporting the proposition that there is no rigid requirement that a plaintiff must always be limited to its net economic injury where such a limitation would be inequitable or contrary to deterrent goals," *id.* at 490, the court concluded that Minpeco had "made no showing that if an offset is imposed here defendants will be either unjustly enriched or sheltered from any 'appreciable liability' as in *Loftsgaarden*," *id.* at 490.

Likewise, in this case, requiring each counterclaimant to net out its gains and losses will neither unjustly enrich Apex, nor shelter it from any appreciable liability, nor undermine the goal of deterrence. There is no unjust enrichment where a claimant has actually *benefited* from the alleged wrongdoing of another. New York law, for example, permits a recovery for unjust enrichment where a plaintiff has shown that "(1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution." *Hutton v. Klabal*, 726 F.Supp. 67, 72 (S.D.N.Y.1989). In this case, of course, far from being at the defendants' expense, the circumstances that led to Apex's enrichment also benefited Belcher NY/NJ. I note further that Apex does not avoid appreciable potential

liability by having those counterclaims dismissed. Stinnes, also a counterclaimant, has alleged that it suffered "cumulative" damages of $1,519,186. *See* Defendants' Exhibit NR, Ex. D to Hoffman Aff. (April 18, 1990). (The figure claimed by Stinnes as cumulative damages is derived by subtracting Stinnes' net profits from its net losses. *See id.*) Furthermore, as discussed below, the counterclaims of Coastal States Marketing also remain. Thus, dismissal of Belcher NY/NJ's $1,090,286 damage claim does not get Apex off the hook. I agree with Apex that Stinnes, who has suffered net damages, is an appropriate claimant against Apex in this case,[5] and I also find, for the reasons discussed *infra*, that Coastal States Marketing is an appropriate claimant. Finally, I do not agree with Coastal/Belcher that deterrence goals are undermined by dismissal of the Belcher NY/NJ counterclaims. Both the CEA and New York's cause of action for common law fraud contemplate damages only to injured parties, as discussed above. To permit damages to those who actually benefited from alleged fraud and manipulation would merely provide a windfall to those claimants. As the court said in *In re Investors Funding Corp.*, 523 F.Supp. 563, 566 (S.D.N.Y.1980), in the context of a § 10(b) claim,

> In order to maintain an action for damages under Section 10(b), a plaintiff must have actually suffered injury as a consequence of the acts of the defendant complained of. Similarly, Section 11 provides for damages for purchasers who incurred losses as a result of false registration statements, and does not provide an additional windfall to persons who actually profited overall from such statements.

(Citations omitted.) Similarly, in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 717, 94 S.Ct. 2578, 2586, 41 L.Ed.2d 418 (1974), a case in which a corporation sought recovery under the federal antitrust and securities laws for corporate mismanagement, the Supreme Court rejected the claim that deterrence goals alone would justify a damage recovery:

> Our difficulty with this argument is that it proves too much. If deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice. No injury or violation of a legal duty to the particular plaintiff would have to be alleged. The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning. Suffice it to say that we have been referred to no authority which would support so novel a result, and we decline to adopt it.

(Footnote omitted).

Coastal/Belcher has provided no precedent, and the court knows of none, for permitting damage claims for common law fraud or CEA violations in cases where the claimant actually benefited from the alleged wrongdoing. This is simply not a case, like *Loftsgaarden*, where a claimant who had suffered damages was made more than whole. Rather, it is a case where no damages are recoverable by Belcher NY or Belcher NJ because the claimants have not suffered damages but have actually prospered as a result of the alleged wrongdoing.

### B. *"Piercing the Corporate Veil"*

■ Coastal/Belcher's figures reveal that Belcher NY/NJ collectively enjoyed a net profit of $1,277,850 while Coastal States Marketing suffered a net loss of $485,030. Coastal/Belcher argues that this court should not "pierce the corporate veil" by treating Belcher NY/NJ and Coastal States Marketing as one entity. Coastal Corporation, the parent holding company of these three entities, is organized such that, during the time period relevant to this lawsuit, Belcher NJ was a subsidiary of Belcher NY, which was a subsidiary of Coastal Petroleum Corporation, which, in turn, was a subsidiary of the Coastal Corporation. Coastal States Marketing was a subsidiary of Coastal States Petroleum Company, which, in turn, was a subsidiary of the

---

5. I note that Bankruptcy Judge Schermer has informed me since the filing of this motion that the Stinnes counterclaims have been settled.

Coastal Corporation. *See* Belcher's Opposition Memo at 12 n. 9; Corporate Organization Chart, Tab 40 to Aff. of Michael Lesch (June 4, 1990).

"Piercing the corporate veil" is a legal principle that is most commonly used to impose liability in particular circumstances. As Judge Walker explained earlier in this case, "[p]iercing the corporate veil is an equitable remedy allowing one injured by the fraudulent action of a subsidiary corporation to look to the parent corporation for redress." *Apex*, 713 F.Supp. at 611 (finding that the New York Mercantile Exchange could not fasten liability on Apex for the acts of the St. Louis Commodities Corporation, Apex's wholly owned subsidiary).

With respect to Coastal/Belcher's counterclaims, of course, Belcher NY/NJ and Coastal States Marketing are *claimants* rather than potentially liable parties. Accordingly, Apex argues that Coastal/Belcher's veil-piercing analysis is misplaced and that all three subsidiaries should be treated collectively for purposes of assessing damages.

In *Minpeco, S.A. v. Hunt*, 686 F.Supp. 427 (S.D.N.Y.1988),[6] Judge Lasker rejected a similar argument, made by defendants in that case, that a state-owned corporation was obligated to include in its calculation of required offset the benefits that accrued to the Government of Peru by virtue of the physical silver holdings of all Peru-owned and -controlled entities. *See id.* at 428–29. Reviewing the evidence that Peru participated in Minpeco's major policy decisions, the court held that "these factors have only limited significance. Clearly, any sole shareholder has a strong legitimate interest in the major decisions of a wholly-owned corporation. For the purposes of establishing an alter ego relationship the more significant question is whether the government exercised *day-to-day control over the instrumentality's operations*." *Id.* at 435. The court laid out the "general principles of corporate law" applicable to

the question whether "a corporation's separate identity will be disregarded":

> there must be such unity of interest and ownership that the separate personalities of the corporation and individual no longer exist, and circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. The common significant factors which would justify disregarding a corporate entity have been undercapitalization, failure to observe formalities, nonpayment of dividends, siphoning of corporate funds by dominant stockholders, nonfunctioning of other officers or directors, absence of corporate records, use of the corporation as a facade for the operations of the dominant stockholder, and use of the corporate entity in promoting injustice or fraud.

*Id.* at 432–33 (citing, *inter alia*, 1 *Fletcher Cyclopedia of the Law of Private Corporations* § 41.30 at 428–29 (perm ed. 1983)). While Apex argues that "the critical reasoning in *Minpeco* involved applying rules applicable to state enterprises which involved issues of sovereignty and comity," Memorandum of Apex in Further Support of its Motion for Summary Judgment at 6–7 (August 9, 1990), I note that the context of Judge Lasker's use of general principles of corporate law in deciding an offset question illustrate that those principles have application even when a corporation, government-owned or not, is a claimant rather than a potentially liable party.

I note further that in the bankruptcy context, where the question of offset frequently arises, parents and their subsidiaries are treated separately. *See, e.g., MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n. 2 (2d Cir. 1989) ("under federal bankruptcy law, a subsidiary's debt may not be set off against the credit of a parent"); *In re Elcona Homes Corp.*, 863 F.2d 483, 486–87 (7th Cir.1988) (in certain "triangular" setoff cases, "a subsidiary or other affiliate of the creditor owes money to the bankrupt and the two affiliates ask that they be treated as a single entity. This is rebuffed by pointing out that, *save in exceptional*

---

6. I note that Judge Lasker's decision there was subsequent to his earlier *Minpeco* decision, 676

F.Supp. 486 (S.D.N.Y.1987), which is cited earlier in this opinion. *See* p. 55, *supra*.

*circumstances, corporate and commercial law treat affiliated corporations as separate enterprises"*) (emphasis added; citations omitted).

Although Apex points out that in some cases parent and subsidiary are regarded as a single economic unit, *see, e.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (parent and wholly owned subsidiary treated as single enterprise for purposes of § 1 of the Sherman Act), I agree with Coastal/Belcher that, in determining whether Coastal States Marketing should be permitted to pursue damages in the face of profits reaped by other Coastal Corporation subsidiaries, the proper inquiry is whether the Coastal Corporation exercised day-to-day control of its subsidiaries. To answer that inquiry in the affirmative, Apex bears a heavy burden. *See Bellomo v. Pennsylvania Life Co.,* 488 F.Supp. 744, 745 (S.D.N.Y.1980) ("Only day to day control by the parent 'so complete that the subsidiary is, in fact, merely a department of the parent,' will warrant such a finding") (holding that a parent and its subsidiaries were not the same entity for jurisdictional purposes, even though the subsidiaries were wholly owned by the parent; the parent was a holding corporation that engaged in business solely through its subsidiaries; the annual reports described the business of the parent, the subsidiaries and the sub-subsidiaries as if it was all part of a common enterprise; and the annual reports consolidated earning statements).

Apex has presented evidence that Coastal Corporation subsidiaries to some extent coordinated their activities with respect to trading in the futures market during the time period relevant to this lawsuit. *See* William D. Berberich Deposition ("Depo.") at 36–44, Ex. B to Hoffman Aff. (July 5, 1990); Robert L. Frey Depo. at 73–80, Ex. D to Hoffman Aff. Apex also points to the testimony of Francis Kelly, senior attorney in the law department of the Coastal Corporation, who stated in an affidavit that "[i]nvestors are concerned with information about Coastal and its subsidiaries without regard to the specific operations engaged in by the more than 70 Coastal direct and indirect subsidiaries." Kelly Aff. (August 2, 1989) at ¶ 4, Tab 38 to Lesch Aff. (June 4, 1990).

This evidence, while of some significance in ascertaining whether Coastal exercised day-to-day control over it subsidiaries, *see Minpeco,* 686 F.Supp. at 435, is alone insufficient to establish that control, *see id.* at 435; *Bellomo,* 488 F.Supp. at 745. Francis Kelly of Coastal/Belcher has testified that "Coastal subsidiaries are separate legal entities with their own separate books and records and governed by their own officers and boards of directors." Kelly Aff. (August 2, 1990) at ¶ 4. Apex has presented no evidence that Coastal/Belcher subsidiaries are undercapitalized, that the parent and subsidiaries fail to observe corporate formalities, that corporate dividends are not paid, that corporate funds are siphoned off by dominant stockholders, that corporate records are not maintained, or that directors and officers of the separate entities are nonfunctional. *See Minpeco,* 686 F.Supp. at 432–33. The fact that Apex has demonstrated that the Coastal Corporation has a "strong legitimate interest in the major decisions" of its subsidiaries is simply not enough for the court to pierce the corporate veil on this motion for summary judgment. *See id.* at 435. Rather, questions of fact regarding the day-to-day control of the subsidiaries make summary judgment inappropriate. While Apex may present, at trial, evidence in support of its theory that the corporate veil of the Coastal Corporation should be pierced to prevent Coastal States Marketing from recovering damages, the court will not dismiss its counterclaims at this stage.

## CONCLUSION

The court grants Apex's summary judgment motion in part and dismisses the counterclaims of Belcher NY/NJ based on a finding of no net damages. The court denies Apex's motion for summary judgment with respect to the $485,030 damage claim of Coastal States Marketing.

SO ORDERED.