**PRAVIN BANKER ASSOCIATES, LTD., Plaintiff,**

v.

**BANCO POPULAR DEL PERU and the Republic of Peru, Defendants.**

No. 93 CIV. 0094 (RWS).

United States District Court, S.D. New York.

June 15, 1998.

Winthrop, Stimson, Putnam & Roberts by John F. Pritchard, Valerie Fitch, John E. Davis, New York City, for Plaintiff.

Baker & Hostetler by Mark A. Cymrot, Ronald F. Wick, Washington, DC, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff Pravin Banker Associates, Ltd. ("Pravin") has moved for an order of execution (1) granting execution, pursuant to 28 U.S.C. § 1610, upon the obligations of Merrill Lynch & Co. ("Merrill Lynch"), J.P. Morgan Securities, Inc. ("J.P.Morgan"), CS First Boston, Salomon Brothers Inc., and Smith Barney Inc. (the "Underwriters") to pay for certain shares of stock of Telefónica del Peru, S.A. ("Telefónica") in order to satisfy the $2,133,061.11 judgment, plus post-judgment interest (the "Judgment Amount"), rendered by this Court against the Republic of Peru ("Peru") and Banco Popular del Peru (together, the "Defendants") and in favor of Pravin; (2) granting execution upon the undertaking discharging the attachment (the "Undertaking") underwritten by National Union Fire Insurance Company ("National Union") in favor of Pravin; and (3) directing National Union to pay the Judgement Amount to Winthrop, Stimson, Putnam & Roberts, as attorneys for Pravin. For the reasons set forth below, the motion is denied.

### The Parties

Pravin is a Delaware corporation having its principal place of business in New York City.

Banco Popular is a Peruvian state entity organized and incorporated under the laws of Peru and is a foreign state instrumentality as defined in 28 U.S.C. § 1603(b).

Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

### Prior Proceedings

Pravin commenced this action on January 7, 1993. By opinion and order dated February 24, 1994, the Court stayed Pravin's summary judgment motion for six months. *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 165 B.R. 379 (S.D.N.Y.1994) ("*Pravin I*"). By opinion and order dated March 8, 1995, the Court granted Defendants a further stay of sixty days to enable the parties to submit responses to certain questions. *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, No. 93 Civ. 0094, 1995 WL 102840 (S.D.N.Y.1995) ("*Pravin II*"). By opinion and order dated August 24, 1995, the Court granted Pravin's motion for summary judgment in its favor regarding the enforcement of Defendants' obligations under the 1983 financing plan and the guaranty underlying the debt, and denied Defendants' motion to dismiss or stay the action. *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 895 F.Supp. 660 (S.D.N.Y.1995) ("*Pravin III*"), *aff'd*, 109 F.3d 850 (2d Cir.1997). The Clerk of the Court entered judgement on September 5, 1995, and on September 14, 1995, Defendants moved, pursuant to Rule 58, Fed.R.Civ.P., by Order to Show Cause to vacate the judgment on the grounds that the judgment was not for a sum certain. Defendants also moved on September 15, 1995, for an order extending their time to reargue Pravin III. The Court granted both motions on October 12, 1995, and thereafter deemed that the motions would be treated as a Notice of Settlement of Judgment. The Court

granted Pravin's motion for summary judgment regarding enforcement of Defendants' obligations under the letter agreement and guaranty, in a sum certain of $2,083,234.61, plus pre-judgment simple interest accrued from October 26, 1995, through the date of judgment, plus post-judgment interest calculated pursuant to 28 U.S.C. § 1961. *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,* 912 F.Supp. 77 (S.D.N.Y.1996) (*Pravin IV*).

Pravin filed the instant motion on February 2, 1998. Oral argument was heard on March 18, 1998, at which time the motion was deemed fully submitted.

*Facts*

The underlying facts in this matter are set forth in the prior opinions of the Court, familiarity with which is assumed. *See Pravin I, Pravin II, Pravin III,* and *Pravin IV.* The facts relevant to the instant motion are discussed below.

### A. *Telefónica Privatization*

In January 1996, Corporacion Nacional del Desarrollo ("CONADE"), a Peruvian state-owned enterprise, announced plans to sell its remaining 28.6 percent interest in Telefónica through a global stock offering.[1] Telefónica was a legally independent private corporation, subject to Peruvian corporate law, which operated the domestic and long distance telephone service in Peru. CONADE retained the Underwriters for the United States offering of Telefónica stock.

### B. *Pravin Attachment and Discharge Orders*

At a hearing on June 21, 1996, on Pravin's motion to attach the proceeds of the Telefónica transaction and Defendants' motion for a protective order, the Court ordered Peru to inform Pravin when the purchase agreements were signed.

On July 1, 1996, Pravin filed a motion for an order of attachment which sought to attach any property of Peru in the possession of the Underwriters. At a hearing on July 2, 1996, the Honorable John Koeltl (acting in Part I) entered two orders. The first order granted Pravin's motion for an order of attachment (the "Attachment Order"). The second order (the "Discharge Order"), granted Peru's request to deem the Attachment Order served upon the Underwriters and to authorized the discharge of the attachment by the filing of an undertaking pursuant to N.Y.C.P.L.R. § 6222. The purpose of the Discharge Order was to permit the Telefónica transaction to go forward unhindered by the Attachment Order while reserving the legal issues for a later date. By the terms of the Discharge Order, the undertaking would be paid only:

> upon a final determination that the plaintiff is entitled to any property in the possession of the Underwriters pursuant to the order of attachment and levies thereunder and entry of a final judgment in the favor of the plaintiff after the exhaustion of all available appeals in this action.

On July 2, 1996, Peru discharged the Attachment Order and the levies thereunder by delivering to the Clerk of the Court an undertaking in an amount of $2,300,000 (the "Undertaking"). The Undertaking has the same conditions as Judge Koeltl's Discharge Order.

### C. *Telefónica Letters of Credit*

On July 1, 1996, Merrill Lynch and J.P. Morgan (the "U.S. Representatives"), on behalf of the Underwriters, executed letter of credit and reimbursement agreements for irrevocable letters of credit with two London banks: the London branches of Swiss Bank Corporation and Banco Exterior de España. The letters of credit were then issued and confirmed by Banco de Credito del Peru, a

---

1. As part of Peru's privatization program, in February 1994 the controlling interests in Entel Perú S.A. and Compañia Peruana de Teléfonos S.A. were sold by CONADE through a public bid to a group of investors led by Telefónica Internacional de España, S.A. ("Telefónica Internacional"). In December 1996, these companies were merged and became Telefónica. At the end of 1995, Telefónica Internacional held a 35 percent interest in Telefónica in the form of Class A–1 Shares that gave it the right to appoint a majority of the board of directors. A 36.4 percent interest in Telefónica was held by the public, in the form of Class B Shares traded on the Lima Stock Exchange, and a 28.6 percent interest in the form of Class B Shares was held by CONADE.

privately owned bank in Lima, Peru ("Letters of Credit").

Under the terms of the Letters of Credit, the confirming bank was obligated to make payment upon presentation by CONADE of a demand certificate (the "Demand Certificate") and a demand letter (the "Demand Letter"). The Demand Letter was to be executed by Morgan Guaranty Trust Company of New York ("Morgan Guaranty"), as a depositary (the "Depositary") under a separate deposit agreement, confirming to the U.S. Representatives that its custodian in Lima had received the Class B Shares from CONADE. The Demand Certificate was to be executed by CONADE, demanding payment for the stock and providing the confirming bank with instructions for payment in Lima.

Pravin contends that the Underwriters acted as custodian for the Class B Shares and therefore had control over the Demand Letter. Defendants disagree, contending that the Depositary, Morgan Guaranty, along with its representative in Lima, Banco Weise Ltd, were independent from any of the Underwriters.

#### D. *Telefónica Purchase Agreements*

On July 1, 1996, CONADE executed a purchase agreement (the "Purchase Agreement") for the sale of the Class B Shares.

Subject to the terms and conditions set forth in the Purchase Agreement, CONADE agreed to sell to each of the Underwriters, and the Underwriters severally agreed to buy, Class B Shares of Telefónica stock. The Purchase Agreement acknowledged that prior to its execution, the Underwriters had opened the Letters of Credit to provide for the payment for the Class B Shares if all of the terms and conditions of the sale were satisfied by all parties prior to closing. The Underwriters' obligation to purchase the stock was contingent on the occurrence of approximately 20 conditions precedent. The U.S. Representatives also had powers to cancel the agreement at any time if there were (i) any material adverse change in the earnings, business affairs, or business prospects of Telefónica; (ii) a material adverse change in the financial markets in the United States or the international financial markets; (iii) a change or development in the existing political, economic, or regulatory conditions in Peru (including a material devaluation of the nuevo sol against the dollar); or (iv) any event or circumstance relating to the sale that in the sole judgment of the U.S. Representatives could be expected to have a material adverse consequence on the offering.

#### E. *The Deposit Agreement*

Also on July 1, 1996, Telefónica and Morgan Guaranty executed a deposit agreement (the "Deposit Agreement") under which Morgan Guaranty would act as the Depositary on behalf of the holders of American Depositary Receipts ("ADRs"). Under the Deposit Agreement, the Depositary would receive the Class B Shares from CONADE through its custodian in Lima, Banco Weise, a private bank in Lima, and would issue ADRs evidencing American Depositary Shares ("ADSs"). Each ADS represented the right to receive ten Class B Shares. Under the Purchase Agreement, the Underwriters purchased Class B Shares from CONADE and then caused the Depositary to issue ADRs to investors.

#### F. *Telefónica Closing*

On July 8, 1996, CONADE provisionally delivered the Class B Shares to Banco Weise in Lima as custodian under the Deposit Agreement. On July 9, 1996, CONADE delivered a Demand Certificate and Demand Letter to Banco de Credito as provided in the Letters of Credit. Thereafter, Banco de Credito, acting under the terms of the Letters of Credit, paid approximately $896 million, following CONADE's instructions. Then, the Class B Shares were released in by Banco Weise to the Underwriters through an automated book entry on the Caja de Valores de la Bolsa de Valores de Lima, the book entry settlement system of the Lima Stock Exchange. The Underwriters then sold ADRs to investors in the United States.

#### *Discussion*

The issue presented is whether Pravin may attach the property of CONADE, and execute upon that attachment, to collect

a debt owed by Peru where CONADE is organized under the laws of Peru as a separate and distinct juridical entity.[2] Pravin contends that Peru and CONADE should be treated as if they were a single entity, thereby permitting Peru's debt to be collected from CONADE's assets.

Pravin cites the Supreme Court's holding in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) for the proposition that corporate form will not be adhered to blindly "where doing so would cause . . . an injustice." *Id.* at 632, 103 S.Ct. 2591. In that case the Supreme Court addressed the question of whether First National City Bank ("Citibank") may setoff a liability owed to it by the Republic of Cuba ("Cuba") against an amount owed by it to Banco Para El Comercio Exterior de Cuba ("Bancec"). Bancec was an instrumentality of the Cuban government established as a separate juridical entity on April 25, 1960, by Cuba to serve as " '[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity . . . of its own.' " *Id.* at 613, 103 S.Ct. 2591. In September 1960 Bancec sought to collect on a letter of credit issued by Citibank. Within days after Citibank received the request for collection, all of its assets in Cuba were seized and nationalized by the Cuban Government, an action that eventually was held to violate international law. *See Banco Nacional de Cuba v. First Nat'l City Bank*, 478 F.2d 191, 194 (2d Cir.1973). When Bancec brought suit on the letter of credit, Citibank counterclaimed, asserting a right to set off the value of its seized assets. *First National*, 462 U.S. at 613, 103 S.Ct. 2591.

The Supreme Court concluded that "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations" requires that " 'limited liability is the rule, not the exception,' " for government corporations, just as it is for private corporations. *Id.* at 626, 103 S.Ct. 2591 (quoting

*Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944)). Hypothecating facts striking similar to the instant case, the Court reasoned that:

> Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee. As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.

*Id.* at 626, 103 S.Ct. 2591. The Court recognized, however, that consistent with the law of private corporations, principles of equity may require the presumption of separateness to be overcome in certain circumstances, such as "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or if giving effect to separate legal entities "would work fraud or injustice" or would "defeat legislative policies." *Id.* at 629, 103 S.Ct. 2591 (internal citations omitted).

The central fact relied upon by the Supreme Court in holding that a setoff was fair was that the entities that may be held liable for the expropriation of Citibank's assets are the only beneficiaries of any recovery on the original suit. Bancec's rights had been transferred either to Banco Nacional de Cuba ("Banco Nacional"), which had a major role in the nationalization of Citibank's assets, or to Cuba, which had dissolved Bancec shortly after bringing its action. Giving posthumous effect to Bancec's separate juridical status would thus allow Cuba, the real beneficiary of the action, "to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's

---

**2.** Because the Court holds that CONADE is a separate and distinct legal entity and that its property cannot therefore be attached to satisfy a judgment against Peru, the Court need not address Peru's alternative contentions that there was no property in New York subject to attachment, and that Peru did not "waive[ ] its immunity from attachment in aid of execution or from execution either explicitly or by implication" pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1610.

assets."[3]  *Id.* at 632, 103 S.Ct. 2591. Accordingly, barring Citibank's counterclaim would work an injustice.

■  The Second Circuit's decision in *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 782 F.2d 377 (2d Cir.1986), signals that the presumption against breaching the corporate independence of government instrumentalities, although overcome by the unusual facts of *First National*, should not be easily defeated. In that case Banco Nacional brought an action in 1961 for the recovery of funds it had previously deposited with Chemical Bank New York Trust Co. ("Chemical"). Chemical counterclaimed, seeking to set off against Banco Nacional's claim the debt owed to Chemical by Cuban Electric, contending that when Cuba expropriated the assets of Cuban Electric Company, it also assumed its debts. Chemical contended that Banco Nacional was the alter ego of Cuba and therefore Banco Nacional's property should be accessible to pay Cuba's debts. *Id.* at 378. Noting that *First National* requires that "the determination in each case of whether to allow a setoff against a foreign government instrumentality must be made in light of the circumstances of the case ... informed by principles of equity and common law," *id.* at 379 (citing *First National*, 462 U.S. at 628–30, 103 S.Ct. 2591), the court proceeded to distinguish *First National* on the facts that assets Chemical sought to recover were not theirs initially, that a violation of a loan agreement, rather than international law, provided the underlying legal premise for the counterclaim, that there is no record that Banco Nacional played any role in the expropriation or that Cuban Electric assets had been transferred to it, that Banco Nacional's claim was based on a long maintained account, and that there is no "devious use" of the corporate form by the Cuban government. *Banco Nacional*, 782 F.2d at 380. In rejecting Chemical's attempt to scale the corporate limited liability wall, the court concluded that the facts were easily distinguished from *First National* because "there

has never been a single entity that had both the right to enforce the plaintiff's claim and the obligation to pay the debt sought to be collected by the defendant." *Id.*

The record here too does not establish the type of injustice that motivated the Court in *First National*. Pravin seeks to execute upon a debt owed to, or the property of, CONADE. There is no allegation here that CONADE's property should be exposed to Peru's liability because it was responsible for the underlying conduct giving rise to Peru's liability—that is, Peru's failure to pay on its bonds. There is nothing in the record to suggest that Peru transferred the Telefónica stock to CONADE to avoid attachment pursuant to the Pravin judgment. Nor has Peru brought an action in this Court seeking to enforce its rights, while simultaneously seeking to avoid the consequences. Accordingly, the facts in the instant case are not similar to the balance of equities that compelled the Supreme Court to decide not to give legal effect to the separate juridical entities in *First National*.

Pravin contends that equity requires CONADE's property to be imputed to Peru for purposes of executing on a judgment against Peru because CONADE is a "mere conduit" for Peru's privatization efforts, and since (1) the decision to sell the Telefónica shares was made by Peru; (2) the sale proceeds ended up in the Peruvian treasury within a few days of closing; (3) CONADE had only a passive role in the sale; and (4) CONADE was to be liquidated and its assets transferred to Peru's Ministry of Commerce.

These allegations form essentially two theories: first, that Peru directly benefitted from the sale of CONADE property, and therefore CONADE's property should be deemed Peru's property; and second, that Peru controlled the transaction, and CONADE was merely passive, thereby rendering CONADE an alter ego of Peru. Dealing with the "benefit" theory first, the Second Circuit rejected a similar argument in *Banco*

---

3. The Court also rejected Bancec's contention that the counterclaim could not be asserted because the Bancec claim had been transferred to another Cuban government agency that had no role in the expropriation. The Court ruled that

the transfer was a device to gain a litigation advantage and therefore was an abuse of the corporate form. *See id.* at 632–33, 103 S.Ct. 2591.

*Nacional.* Noting that Chemical's contention that the denial of a setoff would be unfair because "(a) Banco Nacional is an instrumentality of the Cuban government, (b) Banco Nacional's success in collecting the balance in its account from Chemical will therefore inure to the benefit of the Cuban government, and (c) it is the Cuban government that has seized the assets of Cuban Electric and refused to pay Cuban Electric's debts," the court concluded that "[a]llowing a setoff solely on this basis would suggest instead a general rule that no instrumentality of any foreign government could collect a debt owed it by an American bank without setoff of any debt owed to that bank by any entity that had been expropriated by that foreign government." *Id.* at 380. *See also Minpeco, S.A. v. Hunt,* 686 F.Supp. 427 (S.D.N.Y.1988) ("[A]rgument [ ] that it would be unfair to recognize [Peruvian instrumentality's] separate status because a recovery by [the instrumentality] would constitute a windfall for Peru is by itself legally insufficient to overcome the *Bancec* presumption.").

Pravin further contends that Peru dominated and controlled CONADE. However Pravin cites no cases holding that the role played by Peru in CONADE's stock sale is sufficient to bypass the corporate form. Pravin cites *Chase Manhattan Bank v. 264 Water Street Assocs.,* 174 A.D.2d 504, 571 N.Y.S.2d 281 (1st Dep't 1991). In that case, however, the parent company not only dominated the debtor corporation, but also "masterminded a scheme to denude the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss to plaintiff." *Id.* at 505, 571 N.Y.S.2d 281. Here Pravin does not assert, nor would the record support, an allegation that Peru established CONADE in 1981 to hold Telefónica stock in a fraudulent scheme to avoid payment to Pravin. Nor is Pravin's citation of *United States Barite Corp. v. M.V. Haris,* 534 F.Supp. 328 (S.D.N.Y.1982), helpful to its contention here. In that case, the court held that a subsidiary was not bound to an arbitration agreement made by its parent because it was *not* its parent's alter ego. The court rejected plaintiff's contention that certain direct conduct by the parent in the

business affairs of its subsidiary sustains ignoring the corporate form. *Id.* at 330.

Indeed, it is unlikely that any privatization similar to the Telefónica transaction could move forward without the active participation, if not control, of the sovereign. Yet, such oversight is similar to the conduct of a majority shareholder, is not unusual, and can not be the basis for ignoring the corporate form. *See also De Letelier v. Republic of Chile,* 748 F.2d 790 (2d Cir.1984) (holding that assets of Republic of Chile's wholly owned national airline could not be attached to satisfy judgment against sovereign even where airline's assets and facilities were under direct control of Chile, Chile could have decreed airline's dissolution and taken over property interests held in airline's name, and Chile had used airline to facilitate conspiracy underlying the judgment); *Minpeco,* 686 F.Supp. at 435 (even if Peru participated in Minpeco's major policy decisions, "these factors have only limited legal significance. Clearly, any sole shareholder has a strong legitimate interest in the major decisions of a wholly-owned corporation").

*Banco Central de Reserva del Peru v. Riggs Nat'l Bank,* 919 F.Supp. 13 (D.D.C. 1994), also cited by Pravin, is not similar to the instant case. In that case, Riggs made loans to Banco de la Nacion, Corporation Financeria de Desarrollo S.A., and Banco Popular del Peru, all of which are wholly owned entities of Peru. The loans were renewed in 1983, at which time Peru unconditionally guaranteed repayment and promised to maintain a $2 million deposit in the name of Banco de la Nacion with Riggs until the debt had been repaid. Riggs received a $2 million deposit from Banco Central de Reserva ("BCR") at about the time it was expecting the deposit from Banco de la Nacion, which never made the deposit itself. Noting that "Riggs is not asserting that BCR and the Republic of Peru are one entity for all purposes, but only for purposes of this transaction," *id.* at 16, the court permitted a setoff by Riggs against the BCR deposit despite its status as a separate legal entity. In that context, the court held that mutuality existed between BCR's deposit and Peru's debt to permit setoff and to avoid fraud or injustice.

Here, however, there is no allegation that Pravin, or prior holders of the Peruvian debt, negotiated for CONADE's assets to secure Peru's debt guaranty.

Accepting Pravin's position would result in a bright line rule similar to the one rejected by the Second Circuit in *Banco Nacional*— that is, that a government instrumentality could not sell, or contract to sell, property without fear that the property would be attached to pay debts of the sovereign. As an instrumentality of Peru, CONADE is entitled to the presumption that its separate and distinct juridical status be respected, and the facts here do not compel any other result. Since CONADE's property cannot by attached by Pravin to collect on a debt owed by Peru, the Attachment Order entered by the court is hereby vacated.

### Conclusion

For the reasons set forth above, Pravin's motion is denied.

It is so ordered.