GENERAL STAR NATIONAL INSURANCE COMPANY, formerly known as the Monarch Insurance Company of Ohio, Plaintiff,

v.

ADMINISTRATIA ASIGURARILOR DE STAT, Carom, S.A., Asigurarea Romaneasca, S.A. and Astra S.A., Defendants.

No. 18 MS 302.

United States District Court,
S.D. New York.

May 12, 2010.

## MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief Judge.

Plaintiff General Star National Insurance Company ("Plaintiff")[1] brings this action seeking a writ of execution and restraining notice against the Romanian Bank of Foreign Trade ("RBFT")[2] and its purported successors-in-interest, Banca Comerciala Romana ("BCR") and Erste Bank ("Erste"), pursuant to 28 U.S.C. § 1610 and Federal Rule of Civil Procedure 69(a) ("Rule 69(a)"). For the reasons stated below, Plaintiff's motion is DENIED.

## I. BACKGROUND

### A. The Contract Dispute

The original action in this case arose out of a dispute regarding reinsurance contracts entered into by Plaintiff and Administratia Asigurarilor de Stat ("ADAS"), a formerly state-owned Romanian insurance company, between 1974 and 1981. (Supplemental Declaration of Pieter Van Tol Dated February 2, 2004 ("Pl. Supp. Decl.") Ex. C; Memorandum of Law of General Star National Insurance Company in Support of Its Application for a Writ of Execution, Restraining Notice and Order Allowing Discovery ("Pl. Memo. Dec. 2003")). In 1991, shortly after the overthrow of the communist regime in Romania, the Romanian government dissolved ADAS and es-tablished three new companies to take over ADAS's operations: Astra, S.A. ("Astra"), Carom, S.A. ("Carom"), and Asigurarea Romaneasca, S.A. ("Asirom"). *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat,* 289 F.3d 434, 436 (6th Cir.2002). Astra was ordered to assume ADAS's international and reinsurance interests, while the other two companies were ordered to assume responsibility for ADAS's other insurance operations. *Id.* Following the dissolution of ADAS, money owed to Plaintiff was not remitted as required under the reinsurance contracts. *Id.*

### B. Procedural History

On October 14, 1998, Plaintiff filed a complaint in the Southern District of Ohio against the three successor companies asserting claims for breach of contract and unjust enrichment. (Pl. Supp. Decl. Ex. C.) The successor companies failed to respond to Plaintiff's complaint, and on March 17, 1999, the court granted Plaintiff's motion to enter default judgment against the companies ("March Judgment"). (Declaration of Pieter Van Tol dated August 13, 2009 ("Pl. Decl. Aug. 2009") Ex. A.)

On March 16, 2000, the successor companies filed a motion to vacate the default judgment pursuant to Federal Rule of Civil Procedure 60(b) on the grounds of lack of subject matter jurisdiction and insufficient service of process. *See Gen. Star,* 289 F.3d at 437. The court granted the motion to vacate the default judgment against Carom and Asirom but denied the motion as to Astra on the ground that Astra was the successor-in-interest to

---

**1.** General Star was formerly known as The Monarch Insurance Company of Ohio.

**2.** RBFT is also known as Romana de Comert Exterior, S.A., or "BANCOREX." (Memoran-dum of Law of Banca Comerciala Romana in Opposition to Plaintiff's Application for a Writ of Execution, Restraining Notice and Order Allowing Discovery) ("BCR Opp. Memo.") at 3.

ADAS's reinsurance contracts. *Id.* Astra appealed the denial of its motion to vacate, and the denial was affirmed by the Sixth Circuit on May 7, 2002, holding that Astra was properly found to be the successor-in-interest to the reinsurance contracts. *Id.* at 436.

In accordance with the provisions of the Federal Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(c), Plaintiff moved the district court for authorization to commence post-judgment collection efforts against Astra and ADAS. (Pl. Memo. Dec. 2003 at 4.) The court granted Plaintiff's motion on September 16, 2002 ("September Order"). *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat,* No. C298–1051 (S.D.Ohio Sept. 16, 2002) (order allowing attachment or execution of the judgment); (Pl. Decl. Aug. 2009 Ex. B.) In the September Order, the Ohio district court found that "[t]he Government of Romania is the alter ego of Astra and the former ADAS." *Id.* at 1. Accordingly, the court permitted Plaintiff to attach the assets of ADAS, Astra and, as their alter ego, the Government of Romania (collectively "Defendants") in order to satisfy the default judgment. *Id.* at 2.

Following the September Order, none of the Defendants responded to discovery requests from Plaintiff seeking information regarding the location of assets. (Pl. Memo. Dec. 2003 at 5.) Defendants failed to respond to the court's order to appear for an examination on March 3, 2003, and the court ordered them to show cause why they should not be held in civil contempt. (Pl. Decl. Aug. 2009 Ex. D.) Defendants again failed to respond to the order to show cause and were held in civil contempt on July 15, 2003. (*Id.* Ex. E.) On October 9, 2003, the court sanctioned Defendants by entering final judgment on the order finding Defendants in contempt and the September Order allowing attachment or execution of the judgment entered on March 17, 1999 ("October Judgment"). (*Id.* Ex. F.) The Defendants did not *appeal* the court's entry of final judgment. (Pl. Memo. Dec. 2003 at 5); *see* Fed. R.App. P. 4(a)(1)(A) ("[T]he notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after the judgment or order appealed from is entered.").

Unable to satisfy its judgment in Ohio, Plaintiff sought to execute the judgment in New York. Plaintiff registered the March and October Judgments with this Court in December 2003. The judgment of the Southern District of Ohio, having been properly registered, has the same effect in this Court and may be enforced in an identical manner. 28 U.S.C. § 1963. Accordingly, Plaintiff filed an application for a writ of execution against RBFT on the theory that it was an alter ego of the Romanian government. (Pl. Supp. Memo. at 3.) RBFT was established under Romanian law as "a central state institution whose mission [was] to effect state goals concerning payments, credit, and currency control in foreign trade. Furthermore, by virtue of the Romanian Constitution, all banks [were] State property." *S & S Mach. Co. v. Masinexportimport,* 706 F.2d 411, 414 (2d Cir.1983) [hereinafter *S & S Mach. I* ].

After effecting service, Plaintiff became aware that RBFT was acquired by, or merged with, BCR and no longer existed as an independent entity. (Pl. Supp. Decl. at 1.) BCR, RBFT's purported successor-in-interest, was established as an "independent joint stock commercial bank company under the laws of the Republic of Romania in 1990." (Def. Memo. Jan. 2004 at 3.) The Romanian government was BCR's sole shareholder until 1993 when, as part of the government's privatization program, seventy percent of BCR's shares were transferred to a State Ownership Fund ("SOF"), and thirty percent of the

shares were transferred to Private Ownership Funds. (*Id.*) On September 30, 1999, BCR "acquired the assets" of RBFT. (*Id.*)[3] In 2000, as part of an effort to privatize the bank fully, SOF's shares in BCR were transferred to the Authority for Privatization and Management of the State Ownership ("APMSO"). (*Id.*) In 2006, the Authority for State Assets Recovery ("AVAS"), another Romanian government entity,[4] sold a majority of BCR's shares to Erste, an Austrian Bank. (Letter from Lewis Smoley dated July 21, 2008; Agreement of Sale and Purchase of Shares of Banca Comerciala Romana S.A., dated December 21, 2005) ("Sale Agreement".) Plaintiff now seeks to enforce the judgment against BCR as RBFT's successor-in-interest or, alternatively, as the alter-ego of the Romanian government. (Pl. Supp. Memo. at 3.)

This matter was initially presided over in this district by Judge Richard Owen. Judge Owen held hearings on February 5, 2004 and February 12, 2004. (Affirmation of Lewis M. Smoley dated Mar. 4, 2004 ("Smoley Aff. Mar. 2004") Exs. 1, 2.) During the latter hearing, Judge Owen heard testimony from Florian Iliescu, the manager of BCR's representative office in New York, in an attempt to determine the extent of control, if any, that the Romanian government exercised over BCR. (Smoley Aff. Mar. 2004 Ex. 2.) Judge Owen also heard testimony from a purported expert, Mark Meyer, regarding the changes in the Romanian banking system following the overthrow of the communist regime in 1989. (*Id.*)[5]

In December 2008, Plaintiff served a subpoena on BCR seeking the production of documents concerning the acquisition of the majority of shares of BCR by Erste. (Pl. Decl. Aug. 2009 Ex. L.) Plaintiff also specifically requested any documents concerning any indemnification agreement between Erste and the Romanian government for the liabilities of BCR or RBFT. (*Id.*) Lastly, Plaintiff requested the production of any documents regarding the closure of BCR's office in New York. (*Id.*)

BCR did not object to the subpoena but nonetheless failed to respond. Counsel for BCR sent a letter to Judge Owen on April 28, 2009 informing the court that, despite his best efforts, he was unable to make contact with BCR after receipt of the subpoena. (Letter of Lewis M. Smoley dated April 28, 2009.) The matter came before this Court on April 28, 2009 while sitting in Part I upon receipt of BCR's letter to Judge Owen. In the hope of provoking a response by BCR, this Court ordered that BCR respond to the subpoena by July 9, 2009 [dkt. no. 89]. Plaintiff informed the Court in a letter dated July 15, 2009 that BCR, despite the Court's order, failed to respond to the subpoena, and Plaintiff notified the Court of its intention to move for sanctions.

The following day, July 16, 2009, counsel for BCR requested that the Court relieve him as counsel and informed the Court that BCR intended to retain substitute counsel. (Affirmation of Lewis M. Smoley dated July 16, 2009 ("Smoley Aff. July 2009").) The Court issued an order to

---

**3.** The nature of this transaction is disputed by Plaintiff, but as it is irrelevant to the Court's decision, it will not be addressed. *See infra* Section II.A.2.

**4.** The parties' submissions do not explain the relationship between APMSO and AVAS, but it appears that AVAS was established, like APMSO, for the purpose of privatizing the

Romanian government's holdings in various companies.

**5.** It is not apparent from the record whether Mr. Meyer was accepted as an expert by Judge Owen. Regardless, his testimony is addressed here only insofar as Plaintiff has relied on the testimony in its submissions to the Court.

show cause why an order should not issue relieving BCR's then-counsel as attorney of record for BCR [dkt. no. 114]. On August 17, 2009, Plaintiff moved for an entry of default judgment against BCR in the amount of the original judgment against Defendants for failure to comply with the Court's order of June 9, 2009 [dkt. no. 125]. On August 31, 2009, this Court then ordered that Withers Bergman LLP be substituted as counsel for BCR in place of Davidoff Malito & Hutcher LLP [dkt. no. 134]. Following substitution of counsel, BCR produced the documents requested by the subpoena to the satisfaction of Plaintiff, and the motion for default judgment was withdrawn. (Letter from Pieter Van Tol dated September 16, 2009.)

According to Plaintiff, the documents produced by BCR reveal that the Romanian government, in conjunction with its sale of BCR to Erste, agreed to indemnify Erste for any pre-acquisition liabilities incurred by RBFT. (*Id.*) The translated sale agreement between AVAS and Erste states in relevant part that "[t]he Seller undertakes to indemnify the Purchaser against any damages incurred as a result of or in connection with the Obligations of Bancorex (RBFT), provided that ... (i) [i]n case of a Legal Claim, the said claim against the Bank shall be set by a final and binding court order made enforceable." (Sale Agreement.)

Plaintiff has offered to submit proposed findings of facts and conclusions of law on its motion for a writ of execution. (*Id.*) Because BCR's closure of its New York office, its merger with Erste, and the indemnification agreement between Erste and the Romanian government are the only new facts presented since the submission of Plaintiff's memoranda, and because these facts are not relevant to the Court's analysis, the motion will be decided without further briefing.

## II. *DISCUSSION*

Plaintiff presents two alternative bases for granting a writ of execution against BCR to satisfy the judgment against the Romanian government: (1) RBFT was an alter-ego of the Romanian government at the time of the judgment, and, as RBFT's successor-by-merger, BCR assumed RBFT's liabilities; or (2) BCR is itself an alter-ego of the Romanian government. For the reasons set forth below, neither of Plaintiff's arguments is availing.

### A. *Plaintiff has not met its burden in demonstrating grounds for disregarding RBFT's corporate form*

■ Plaintiffs are pursuing RBFT on a theory of reverse veil-piercing, which seeks to hold a corporation (RBFT) liable for the actions of its shareholder (the Romanian government). *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir.1997); *Monteleone v. The Leverage Group*, No. CV–08–1986 (CPS)(SMG), 2009 WL 249801, at *3 (E.D.N.Y. Jan. 28, 2009). The Supreme Court has held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626–27, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) [hereinafter *"Bancec"*]. The Court cautioned that "[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty ... [and][a]s a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated." *Bancec*, 462 U.S. at 626, 103 S.Ct. 2591.

In *Bancec*, the Cuban government established a bank to serve as an official

autonomous credit institution for foreign trade. *Id.* at 613, 103 S.Ct. 2591. The Cuban bank sued an American bank, seeking to collect on a letter of credit. *Id.* The American bank counterclaimed, asserting a right to set off the value of its assets that had been seized and nationalized by the Cuban government within days after the Cuban bank filed suit. *Id.* The Cuban government subsequently dissolved the Cuban bank, transferred its assets, and substituted itself as plaintiff. *Id.* at 615–16, 103 S.Ct. 2591. The question presented, therefore, was whether the American bank was entitled to the setoff, despite the fact that the Cuban bank was established as a separate juridical entity from the Cuban government. *Id.*

First, the Court concluded that the FSIA was not intended to affect the substantive law determining liability and thus did not preclude a court from holding liable a foreign instrumentality owned and controlled by a foreign government for actions taken by that government. *Bancec*, 462 U.S. at 620, 103 S.Ct. 2591. In justifying its determination that the American bank was entitled to the set off, the Court cited the inequity of Cuba's attempt to avail itself of the American judicial system to recover on the letter of credit while also attempting to shelter itself from liability to an American bank by transferring the bank's assets to separate juridical entities. *Id.* at 633, 103 S.Ct. 2591. The Court noted that "[t]o hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Id.*

■ According to the Supreme Court, the *Bancec* decision "announce[d] no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded." *Id.* Rather, the decision merely applied "internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." *Id.* at 633–34, 103 S.Ct. 2591. This Court is guided, therefore, by the general principle that the presumption of corporate separateness may be overcome where (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or (2) when recognition of the separate corporate form "would work fraud or injustice." *Id.* at 629, 103 S.Ct. 2591 (internal quotation marks omitted); *see also De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir.1984) ("The *Bancec* Court held that a foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or injustice."); *Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States*, 606 F.Supp.2d 59, 77 (D.D.C.2009) ("This presumption of independence can be overcome in certain circumstances—when 'equitable principles' weigh in favor of treating the independent entity as the sovereign nation itself or when the instrumentality is so extensively controlled by the foreign state that a relationship of principal and agent is created."). Additionally, the *Bancec* Court provided a definition of a typical independent government instrumentality:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically es-

tablished as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Bancec,* 462 U.S. at 624, 103 S.Ct. 2591.

The "[d]etermination of 'who is and is not an agent of whom will be in great part factual,'" *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 448 (D.C.Cir.1990) (quoting *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1029 (D.C.Cir. 1982)), and the burden of producing sufficient facts rests on Plaintiff, *see De Letelier,* 748 F.2d at 795 ("Plaintiffs had the burden of proving that [the agency or instrumentality] was not entitled to separate recognition."); *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) ("To overcome the presumption of separateness afforded to related corporations, Plaintiff's must come forward with the showing of actual domination required to pierce the corporate veil.") (internal quotation marks omitted).[6] As shown below, Plaintiff fails to present facts sufficient to satisfy its burden in justifying the disregard of RBFT's corporate separateness on the basis of either prong of the *Bancec* test. 462 U.S. at 629, 103 S.Ct. 2591.

*1. The case law in this circuit does not require a finding that RBFT was the alter-ego of the Romanian government at the relevant time*

Plaintiff contends that case law in this circuit establishes, as a matter of law, that RBFT was an alter-ego of the Romanian government at the relevant time.[7] In fact, both cases upon which Plaintiff relies merely address whether RBFT qualified as an "agency or instrumentality" under the FSIA, thereby entitling it to certain procedural protections, not whether RBFT's corporate veil should be pierced. The two inquiries are not coextensive, *See, e.g., Foremost–McKesson,* 905 F.2d at 448 (holding that majority shareholding and majority control of a board of directors, while relevant to determining whether an entity is an agency of instrumentality under the FSIA, are not sufficient where a plaintiff seeks to overcome the presumption that a foreign state and its instrumentalities are separate juridical entities); *Hester Int'l Corp. v. Fed. Republic of Nigeria,* 879 F.2d 170, 176 n. 5 (5th Cir. 1989) ("The FSIA uses [the term 'agency'] to determine whether an 'agency' of the state may potentially qualify for foreign sovereign immunity itself under the FSIA. This is a completely different question from ... whether or not the [corporation] enjoyed an alter ego relationship with the [government]."); *EM Ltd. v. The Republic of Argentina,* No. 03 Civ. 2507(TPG), 2010 WL 1404119, at *27 (S.D.N.Y. Apr. 7, 2010) ("It is necessary to recognize that the reference by the Supreme Court [in

---

**6.** Plaintiff states disapprovingly in its memorandum that "BCR offers only conclusory allegations—as opposed to admissible facts—to support its contention that BCR is not controlled by the Romanian government." (Pl. Memo. Feb. 2004.) As BCR carries no burden in these proceedings, it is its prerogative to rely on conclusory statements.

**7.** There is some dispute over whether the relevant date for determining the status of RBFT

is March 1999, when the judgment against the ADAS successor companies was entered, or September 2002, when the court found that Astra was the alter-ego of the Romanian government. This Court need not decide this issue because, as will be shown, Plaintiff has not established that either BCR or RBFT was the alter-ego of the Romanian government in either 1999 or 2002.

*Bancec* ] to 'agent' is a reference to something different from 'agency' as used in the FSIA.").

In *Gadsby & Hannah v. Socialist Republic of Romania,* the plaintiff obtained a judgment against the Socialist Republic of Romania for unpaid legal fees. 698 F.Supp. 483, 484 (S.D.N.Y.1988). At issue in the case was the plaintiff's purported noncompliance with the FSIA in restraining the assets of RBFT. *Id.* at 484–85. The FSIA provides certain procedural protections and immunities to an agency or instrumentality of a foreign state in the event a plaintiff seeks attachment of its assets. 28 U.S.C. § 1609. The FSIA defines an "agency or instrumentality" as "(1) . . . a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603. In determining that RBFT was entitled to the procedural protections of the FSIA, the court in *Gadsby* relied on a Court of Appeals case holding that "[c]onvincing and uncontroverted evidence established that the [RBFT] is but a cat's paw of the Romanian government— an instrumentality owned and controlled by the state" and that as such RBFT is entitled to the protection of the FSIA. *S & S Mach. I,* 706 F.2d at 414 *S & S Mach. I.* As in *Gadsby,* the Court of Appeals in *S & S Mach. I* was addressing whether RBFT was entitled to the protections of the FSIA as an agent or instrumentality of the Romanian government and was thereby immune from prejudgment attachment. 706 F.2d at 412.

Because *Gadsby* and *S & S Mach. I* were addressing only the need for plaintiffs to comply with the FSIA, neither decided whether RBFT was the alter-ego of the Romanian government. The court in *Gadsby* stated that it was "presently inclined to the view that any post-judgment attachment plaintiff might get would extend to deposits maintained in New York City by [RBFT]" and that "[t]he fact that [RBFT] is a mere agent or instrumentality of the Romanian government for purposes of claiming immunity and procedural protection under the FSIA would seem to subject the funds of the Romanian Bank to attachment to satisfy the debt of its principal—Romania." 698 F.Supp. at 486. *Gadsby* went on to state in a footnote that, "[g]iven the case law in this Circuit, [RBFT's] funds are *prima facie* subject to attachment in this case, and the Bank has the burden of showing otherwise." *Id.* at 486 n. 8. Plaintiff characterizes *Gadsby* as holding (1) that RBFT was the alter-ego of the Romanian government as a matter of law, and thus (2) funds of RBFT were *prima facie* subject to attachment in order to satisfy a judgment against the Romanian government in *all* cases. (Pl. Memo. Feb. 2004 at 4.) First, Plaintiff's characterization contradicts established precedent that the plaintiff bears the burden of showing facts sufficient to establish an agency relationship. *See, e.g., Letelier,* 748 F.2d at 795 ("Plaintiffs had the burden of proving that [the state instrumentality] was not entitled to separate recognition."). Regardless, the court's holding that RBFT was entitled to the protections of the FSIA and that the plaintiff had failed to comply with the provisions of the statute was dispositive of the case, and the statements regarding the possible attachment of RBFT's assets in the future were mere dicta.

Likewise, the Court of Appeals in *S & S Mach. I* only addressed the applicability of the protections of the FSIA to RBFT and did not address the separate issue of whether the corporation was the alter-ego of the Romanian government. Because the plaintiff was asserting a claim against the corporation directly, not as an agent of the Romanian government, the court was

not required to address the alter-ego issue. 706 F.2d at 412. Although the court also mentioned the control exercised by the government over RBFT, it did not do so in the context of determining whether to disregard the corporate form. Neither of these cases, therefore, directly supports a finding that RBFT was the alter-ego of the Romanian government for the purposes of piercing the corporate veil.

Even if these decisions supported the piercing of RBFT's corporate veil at the time they were issued, Plaintiff is unable to demonstrate why their reasoning should be applicable over ten years later, following the revolutionary overthrow of the communist regime. The *Gadsby* decision was issued in 1988, and the *S & S Mach. I* decision was issued in 1983. 698 F.Supp. 483 (S.D.N.Y.1988); 706 F.2d 411 (2d Cir. 1983). In support of its argument, Plaintiff points to a 1992 decision that purportedly demonstrates that the Romanian government continued to exercise control over state-owned entities after the 1989 revolution. *See S & S Mach. Co. v. Masinexportimport*, 802 F.Supp. 1109 (S.D.N.Y.1992) [hereinafter *"S & S Mach. II "*]; (Pl. Supp. Memo. 2004.) A closer examination of the case's procedural history reveals that Plaintiff misconstrues its import.

In *S & S Mach. I*, the Court of Appeals affirmed the district court's determination, in 1982, that Masinexportimport ("Masin"), a machine tool trading company wholly owned and controlled by the Romanian government, was an "agency or instrumentality" of the Romanian government under the FSIA. *S & S Mach. I*, 706 F.2d at 413–

15. Because qualification under the FSIA protected Masin's assets from attachment, the court concluded that the plaintiff could not be permitted to restrain Masin's assets by means of an injunction when an attachment of those assets would be improper. *Id.* After the injunction was vacated, the action was remanded, and the plaintiff prevailed at trial in 1991, obtaining a judgment against the defendant in *S & S Mach. II*, 802 F.Supp. at 1109–10.

Having been thwarted in its collection efforts, the plaintiff then sought an order from the court piercing the corporate veil between the defendant and the Romanian government. *Id.* at 1110. The court denied the plaintiff's motion on other grounds, but first held that the "[d]efendant's status as a Romanian agent or instrumentality is," given the decision of the Court of Appeals in *S & S Mach. I*, "the law of the case, and the Supreme Court's standard for piercing the corporate veil is thereby satisfied." *S & S Mach. II*, 802 F.Supp. at 1110 (citing *Bancec*, 462 U.S. 611, 103 S.Ct. 2591 (1983)). First, as explained above, a defendant's status as an agent or instrumentality under the FSIA does *not* alone satisfy the *Bancec* standard for piercing the corporate veil. Second, the court in *S & S Mach. II* clearly made no findings of fact regarding the relationship between Masin and the Romanian government in 1992. Rather, it merely relied on the "law of the case" already established by the district court's initial determination in 1982 that Masin was an agent or instrumentality of the Romanian government.[8] *S & S Mach. II*, 802

---

8. The court in *S & S Mach. II* would have been mistaken in merely relying on a prior finding that Masin was an agent or instrumentality under the FSIA in determining whether to pierce the corporate veil. However, it appears from the Court of Appeals opinion in *S & S Mach. I* that sufficient evidence was presented demonstrating not only that Masin was "an organ of a foreign state or political subdivision thereof," 28 U.S.C. § 1603, but also that Masin was "so extensively controlled by its owner that a relationship of principal and agent [was] created." 462 U.S. at 629, 103 S.Ct. 2591. *See S & S Mach. I*, 706 F.2d at 415 ("Masin established its status as a state-owned and state-*controlled* trading company with specific evidence.")

F.Supp. at 1110. Plaintiff is, therefore, incorrect that *S & S Mach. II* stands for the proposition that the Romanian government continued to exercise control over state-owned entities as late as 1992; the court made no such finding.

2. *Plaintiff has not offered facts sufficient to support a finding that RBFT was the alter-ego of the Romanian government at the relevant time*

Aside from this case law, Plaintiff offers scant independent evidence to show that RBFT was the alter-ego of the Romanian government. Plaintiff offers a May 1, 1997 news article stating that the management of RBFT remained "highly politicised" and that the president of the bank was ousted for political reasons. (Pl. Decl. Mar. 2004 Ex. 2.) Another article states that "successive [Romanian] governments were in the habit of putting pressure on [RBFT] . . . and other state-owned banks, to hand out soft loans to favoured firms in industry and agriculture." (*Id.* Ex. 3.) According to Plaintiff, "Mr. Meyer admitted that the selection of the Romanian Bank's president in 1997 was 'a political decision.'" (Pl. Supp. Memo. At 6–7 (quoting Smoley Aff. Ex. 2 at 95–96).) The entire exchange went as follows:

> MR. VAN TOL: Is it a fair statement that in 1997, notwithstanding these laws that you have been saying were passed, that, in fact, the determination of who ran the banks was determined by the government?
>
> MR. MEYER: There—it was certainly a political decision that went into who would be a leading officer of the bank. It was political as well as professional. Rasmatemmishon, who is mentioned in this article is a professional banker, but I—yes, of course, there is a political aspect to it.

(emphasis added). Therefore, *S & S Mach. II* does not stand for the proposition that mere

(*Id.*) Mr. Meyer also stated that at the time of a government bailout of RBFT in 1998, RBFT was "making bad loans," and that "to the best of [his] knowledge, there was [sic] a lot of political machinations that resulted in a catastrophe." (*Id.* at 104.)

Regardless of the motive behind the decision of who to appoint to run the government-owned bank, the only relevant question here is whether the government continued to exert control over the appointee in his daily operations of the bank, and Plaintiff has not provided sufficient evidence in this regard. Likewise, the unfortunate incidence of political corruption, especially in light of the lack of evidence regarding its frequency or scope, does not establish the type of "extensive[ ] control[ ]" required to disregard the corporate form. *Bancec,* 462 U.S. at 629, 103 S.Ct. 2591.

Plaintiff also offers two articles describing the government bailout of RBFT in 1998 and argues that the government rescue entailed the government's exercising control over the bank's daily activities. (Pl. Supp. Memo. 2004 at 7; Van Tol Decl. Mar. 2004 Exs. 4–5.) According to the article submitted by Plaintiff, dated January 1, 1998, "[i]n order to strengthen the financial position of [RBFT] . . . the Romanian government . . . adopted an emergency plan transferring Lei 4.5 trillion ($53.28 million) to the Ministry of Finance (MoF) in return for five-year, variable rate Government bonds at market rates." (*Id.* Ex. 4.) In return, the "problem loans acquired by MoF [were] to be collected by [RBFT]. The performance of the bank in managing and recapturing bad loans for the government [was] supervised by a special committee consisting of seven members representing the MoF, the central bank, the State Ownership fund and

instrumentality status under the FSIA satisfies the *Bancec* test for piercing the corporate veil.

[RBFT]." (*Id.*) An article dated April 1, 1999 further indicated that a "special administration regime" and restructuring plan were imposed on RBFT to facilitate "the downsizing of the balance sheet and activity of the bank." (*Id.* Ex. 5.)

A similar argument was presented in *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289 (S.D.N.Y.1987). In *Baglab*, the plaintiffs, alleging injury from a wrongful refusal of financing, sought to disregard the separate corporate identity of a bank on the theory that during a government-led rescue of the bank the English government exercised such extensive control over the bank that a relationship of principal and agent was created. 665 F.Supp. at 296–97. Despite much greater evidence of control than that presented here, *id.* at 295, and the fact that the harm in question occurred *during* the bailout and was *caused* by the bank itself, the court concluded that "beyond wishful characterization, plaintiffs have not substantiated their allegations that the Bank of England so closely supervised [the bank] that the Court would be warranted in imputing the decision not to lend to plaintiffs to the Bank of England," *id.* at 296. Here, Plaintiff's allegations are even more deficient. The evidence offered merely demonstrates that a government rescue occurred and that the Romanian central bank supervised, to some extent, the bank's restructuring. Creditors are often able to impose constraints and conditions on debtor companies, but the exercise of such power does not necessarily make the creditor the alter-ego of the debtor company. The evidence Plaintiff presents reveals nothing regarding the extent to which the government controlled RBFT's daily operations in connection with the bailout. *Compare McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351–52 (D.C.Cir.1995) (finding relationship of principal and agent where government controlled routine business decisions, such

as declaring and paying dividends and honoring contracts); *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F.Supp. 660, 666 (W.D.Mich.1985) (finding relationship of principal and agent where all checks above a certain amount were signed by government official and all orders above a certain amount were subject to government approval).

Because Plaintiff has failed to show that RBFT was the alter-ego of the Romanian government at the time of RBFT's transaction with BCR, this Court need not address Plaintiff's successor liability theory. Thus, this Court makes no determination regarding the nature of the transaction between RBFT and BCR and whether it entailed the acquisition of RBFT's liabilities by BCR.

B. *Plaintiff has not met its burden in demonstrating grounds for disregarding BCR's corporate form*

█ Given its inability to present sufficient facts in regard to RBFT, Plaintiff must independently establish that BCR was the alter-ego of the Romanian government at the relevant time. As the Court of Appeals has noted, where the plaintiff is seeking recovery against a foreign agency rather than an equitable set-off as in *Bancec*, "abuse of the corporate form must be clearly demonstrated to justify holding the 'subsidiary' liable for the debts of its sovereign 'parent.'" *De Letelier*, 748 F.2d at 795 n. 1. As will be demonstrated, Plaintiff has failed to meet this burden.

█ It is clear that majority ownership of a corporation's stock, and the powers incident thereto, do not alone constitute sufficient control to satisfy the *Bancec* test. *See, e.g., Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1070 (9th Cir.2002) ("[U]nder *Bancec*, even though an entity or instrumentality is wholly-owned by a

foreign state, that entity is accorded the presumption of independent and separate legal status."); *Pravin Banker Assoc., Ltd. v. Banco Popular del Peru,* 9 F.Supp.2d 300, 306 (S.D.N.Y.1998) ("[S]uch oversight is similar to the conduct of a majority shareholder, is not unusual, and can not be the basis for ignoring the corporate form."). Rather, as explained with respect to RBFT, Plaintiff must demonstrate that the Romanian government exercised sufficient control over the day-to-day operations of BCR so as to establish a relationship of principal and agent. *See, e.g., Minpeco, S.A. v. Hunt,* 686 F.Supp. 427, 435 (S.D.N.Y.1988) ("Clearly, any sole shareholder has a strong legitimate interest in the major decisions of a wholly-owned corporation. For the purposes of establishing an alter ego relationship the more significant question is whether the government exercised day-to-day control over the instrumentality's operations."); *Bellomo v. Penn. Life Co.,* 488 F.Supp. 744, 745 (S.D.N.Y.1980) ("Control through 100% stock ownership does not in itself constitute a subsidiary the alter ego of the parent. Only day to day control by the parent so complete that the subsidiary is, in fact, merely a department of the parent will constitute the requisite control.") (internal quotation marks and citations omitted); *Gabay v. Mostazafan Found. of Iran,* 968 F.Supp. 895, 899 (S.D.N.Y.1997) (recognizing that the "pivotal issue" in determining whether an alter-ego relationship exists is whether the parent exercised "control over the day-to-day activities" of the purportedly separate entity).

█ Plaintiff points to the following facts to demonstrate that such extensive control was present here: (1) BCR's by-laws vest "the management and current administration of the Bank" in a Council of Administration, which is elected by BCR's shareholders (Declaration of Florian Iliescu dated Jan. 15, 2004 ("Iliescu Decl.") Ex. 3 at Article 33); and (2) In 1998, BCR's

majority shareholder was a Romanian government entity that, through its shareholder voting rights, was able to control the Council of Administration "and, hence, the operations of BCR." (Pl. Memo. Feb. 2004 at 9.). These facts are plainly inadequate to establish that the Romanian government exercised day-to-day control over BCR. As explained above, the exercise of power incidental to majority stock ownership cannot form the basis for disregarding the corporate form. *See, e.g., Pravin,* 9 F.Supp.2d at 306. Control over the board of directors by means of shareholder voting rights is a prerogative of any majority shareholder and, therefore, is not at all dispositive of the issue presented here.

Despite Plaintiff's assertions to the contrary, an examination of BCR's bylaws demonstrates that BCR was organized as a typical independent juridical entity. Article 19 of BCR's bylaws states that the management and administration of the bank shall be vested in the General Meeting of Shareholders, the Administration Board, the Board of Directors, and the President and Vice–Presidents. (Iliescu Affidavit Ex. 3 at Art. 19.) At the General Meeting of Shareholders, the shareholders are permitted to "elect the administrators and auditors." (*Id.* at Art. 24(b).) The bylaws further provide that the "Council of Administration [is] staffed by nine members appointed for a four years [sic] period, who may be re-elected every four years." (*Id.* at Art. 33.) "[T]he President and the Vice-presidents of the Administration Board who are also the President and Vice-presidents of the Bank respectively, are appointed by the General Meeting of Shareholders. They are mandated to run and coordinate the current activity and are given the competence to commit the Bank's responsibility." (*Id.*) However, Article 42 specifies that "[t]he President represents the Bank within the liabilities, assignments and authorities conferred by the

Bank Administration Board." (*Id.* at Art. 42.) Likewise, "[t]he assignments and authorities of the Vice–Presidents are settled by the Bank Administration Board upon the proposal of the Bank President." (*Id.*) Among the Administration Board's enumerated duties is the "appointment of managers, deputy managers and of the [sic] Chief accountants at head office level, and at branches level in the territory" and the appointment of "the Board of Directors, and setting [sic] of their respective authorities." (*Id.* at Art. 37(i)-(j).) The Administration Board is also permitted to "delegate a part of its authorities to a Managing Committee, mandatorily including the president and vice presidents." (*Id.* at Art. 45.) Despite its unfortunate name, the Managing Committee is not granted any management authority beyond that already vested in the Board of Administration. Rather, it appears to be merely a specially designated oversight committee tasked with ensuring compliance with the law. According to Article 46,

> "[t]he assignments and responsibilities of the administrators are regulated by the present statute and by the special norms provided in the Law of commercial companies and by the Banking Law. The Managing Committee and the other administrators are responsible to the Bank for the activity performed by the executive directors or by the employees, when the damages would not have happened if they had performed their surveillance as required by their position. The Managing Committee shall inform the Administration Board on all deviations noticed during the exertion of its obligation for surveillance,"

(*Id.* at Art. 46.) This corporate structure does not indicate that the corporate shareholders were able to exercise any extraordinary power over the day-to-day operations of the bank. Rather, the bylaws describe a structure within which shareholders were limited in their control over the corporation to their election of a supervisory board, the Council of Administration, which in turn appointed management and defined its duties.

Plaintiff nonetheless argues that certain features of BCR's bylaws distinguish this case from a typical situation where a majority shareholder exercises control over the board of directors. According to Plaintiff, these distinctive features are: (1) BCR's board meets on a monthly basis; (2) the board runs and coordinates the "current" activity of the bank; and (3) the board has managerial duties pertaining to the daily operations of the bank. (Pl. Supp. Memo. at 9.)

First, the Court can find no support for the proposition that the requirement that the board meet on a monthly basis is either unusual or probative of daily control. Second, the significance that Plaintiff appears to attach to the word "current" in BCR's bylaws is misplaced. Article 33 of the bylaws states that "[t]he management and current administration of the Bank shall be entrusted ... to a Council of Administration." (Iliescu Affidavit Ex. 3 at Art. 33.) However, Article 37 further states that the board "shall deliberate on major problems," including, *inter alia,* "other aspects relating to current activities." (*Id.* at Art. 37.) Considering that the word "current" appears in the context of a description of "major problems" that require board deliberation, the Court cannot infer that the use of the word indicates that control over daily activities is vested in the board. (*Id.*) Third, Plaintiff's contention that the board "has a long list of managerial tasks that affect the bank's daily operations" is not supported by the contents of BCR's bylaws. (Pl. Supp. Memo. at 9; Iliescu Affidavit Ex. 3 at Art. 37.) Although a board's supervisory authority and ability to set policy and delib-

erate on major decisions may affect the company's daily operations, such supervisory power, common to all boards, is not the type of control that permits the disregard of the corporate form. *See, e.g., Pravin,* 9 F.Supp.2d at 306 (noting that majority shareholder oversight is not unusual and cannot justify ignoring the corporate form); *Minpeco,* 686 F.Supp. at 435 (holding that daily control, not majority shareholder oversight, is the relevant inquiry when making an alter ego determination).

Plaintiff also points to several statements made by the two witnesses, Florian Iliescu and Mark Meyer, in the hearing before Judge Owen in an attempt to strengthen its allegations regarding daily control. (Pl. Supp. Memo. 2004.) Plaintiff argues that the testimony "shows that little changed after 1989, except that the government may have *increased* its day-to-day involvement." (*Id.*) The Court cannot agree with Plaintiff's characterization of the witnesses' testimony.

Mr. Meyer testified that before the revolution, Romanian government ministries "gave instructions to the corporate entities," including RBFT, "on a daily basis ... as to what they were to do." (Smoley Aff. Ex. 2 at 73.) Mr. Meyer specified that the government ministries "would give instructions as to what to do, finance this, issue a letter of credit here for this facility.... [T]he officers of the bank were tools of the government under the communist regime." (*Id.* at 74.) Mr. Meyer qualified his testimony and stated, "I don't mean to say that nothing happened, that no decision was made in the bank on their own. Of course there were, but major decisions came from the ministry." (*Id.* at 74–75.) Plaintiff argues that this statement demonstrates that the prevailing situation pre-revolution, which purportedly supported a finding that the banks were the alter-egos of the government, is closely analogous to the situation post-reform.

Mr. Meyer's statement, however, was merely pointing out the obvious fact that not every single decision made within the government banks under the communist regime was dictated by an outside government minister. This does not imply that the communist government functioned as nothing more than a board of directors that only reviewed major transactions, as was the case with BCR after the revolution. Mr. Meyer's qualification does not alter his explicit testimony that the pre-revolution government was intimately involved with the daily operations of the banks.

According to Plaintiff, "Mr. Iliescu's testimony on BCR's current operations shows that little changed after 1989." (Pl. Supp. Memo. At 5.) Plaintiff states, "Mr. Iliescu testified that on a regular basis he reports to, and consults with, the manager of the international division, Mrs. Tunarearu." (*Id.*) Mr. Iliescu also testified that managers of other departments report to the Vice President "[o]n a daily basis." (Smoley Aff. Ex. 2 at 64.) From this testimony Plaintiff makes the following inference: Because employees report to Mrs. Tunarearu (a manager), and Mrs. Tunarearu reports to BCR's Vice President (a member of the Administration Board), and because the board of directors is appointed by the shareholders, *i.e.,* the Romanian government, then the Romanian government must exert control over BCR employees' daily activities. (*Id.*) Plaintiff's argument is nothing more than a convoluted way of saying that the corporate veil should be pierced because the Romanian government owns a majority of the shares of BCR. In other words, Plaintiff has merely demonstrated that there exists a chain of command in BCR, that this chain of command ends with upper management, and that some of these upper managers sit on the supervisory board. This is the prevailing model at many corporations, and yet the

courts do not routinely disregard the corporate form on that basis. While Plaintiff may disagree with the common practice of permitting the same individuals to simultaneously serve as both officers and directors, this is not an abuse of the corporate form.

Plaintiff also asserts it to be significant that Mr. Meyer testified that employees of APMSO, *i.e.*, the Romanian government, sit on the board of BCR. (*Id.* at 5–6.) It is unremarkable that a majority shareholder would appoint one of its own to serve on the board of directors of a company it owns. It cannot "be assumed that an official from a state entity who serves on the board of directors of another such entity always will act to serve or promote the interests of the sovereign." · *Foremost–McKesson,* 905 F.2d at 448; *see also Minpeco,* 686 F.Supp. at 435 (rejecting plaintiff's argument that the fact that the directors were government employees was probative on the alter ego question, noting that "*Bancec* points to appointment of the board of directors by the government as a *typical* feature of a government instrumentality").

A March 10, 2003 memorandum prepared by the U.S. Department of Commerce is also offered by Plaintiff in support of its contention that BCR was controlled by the government. (Pl. Decl. dated Mar. 2004 Ex. 6.) The memorandum states that "the vast majority of the banking sector remained in state hands throughout most of the 1990s, and ... [BCR] is in the process [of] being privatized." (*Id.* at 21.) It is unclear why Plaintiff attaches any significance to this statement. No one disputes the fact that BCR was state-owned and then went through the process of privatization. The fact that BCR "remained in state hands," therefore, has no bearing on the issue at hand: government *control.* Plaintiff also directs the Court to the memorandum's description of problems in the Romanian legal system, including "an opaque and confusing legal process combined with rapid shifts in laws ... and a widespread perception of political influence in the judiciary." (*Id.* at 26.) Plaintiff argues that the memorandum thus supports its contention that the legal reforms following the overthrow of the communist regime were ineffectual in curbing government control over the banking sector. (Pl. Supp. Memo. at 8.) If BCR bore the burden of proving the absence of government control and merely cited legal reforms as support for its position, then Plaintiff may be correct that political influence in the judiciary would have some probative value for disproving that claim. Here, however, Plaintiff bears the burden of proof, and this Court cannot base a finding that BCR is the alter-ego of the government on the tenuous inference that problems in the judiciary indicate that all post-revolution legal reforms were ineffectual and thus the government must have continued to control BCR.

A comparison with those cases where a sovereign has been held to have exercised sufficient control over a corporation to permit the disregard of the corporation's separate legal personality further demonstrates the inadequacy of the evidence Plaintiff offers. In *McKesson Corp.,* the court affirmed the district court's finding that the Iranian government was answerable for the wrongful denial of dividends to an American shareholder in a government-owned Iranian corporation. 52 F.3d at 347. The court noted that the government-dominated board of directors forced the corporation to "disregard its commercial mission and its duties to [the plaintiff] as a shareholder." *Id.* at 351. The corporation was "no longer a joint stock company whose primary fiduciary duty was to its

stockholders." *Id.* Rather, the primary objective became to protect the interests of the country as the government defined them. *Id.* Thus "Iran's interest became the decisive factor in [the corporation's] actions with regard to [the plaintiff]. Routine business decisions, such as declaring and paying dividends to shareholders and honoring the [corporation's] contractual commitments, were dictated by Iran...." *Id.* at 351–52. Under these circumstances, the court found the district court's finding to be "well-supported" that such "extensive involvement in the day-to-day operations of [the corporation] is evidence of a principal/agent relationship between the [government] and the [corporation]." *Id.* at 352. The court noted that "when a state-controlled corporation implements state polic[y]," and that policy is "designed to injure some of the corporation's own shareholders and to do so through a corporate policy guided by government representatives," the corporation's "separate corporate existence does not shield the state from liability." *Id.* at 353.

Similarly, in *Kalamazoo Spice,* the plaintiff sought recovery from the government of Ethiopia for the expropriation of stock in the plaintiff's Ethiopian corporation. 616 F.Supp. at 661–62. In order to assess whether there was personal jurisdiction over the government, the district court had to determine whether the Ethiopian corporation, operating extensively in the United States and thus possessing the requisite "minimum contacts" to subject it to personal jurisdiction, was the alter-ego of the government, thereby also subjecting the government to personal jurisdiction. *Id.* at 665. The district court concluded that the separate juridical identities of the corporation and the government should be disregarded. *Id.* at 666. The district court based its decision on the fact that, following the expropriation of stock, the government required that all checks in excess of $25,000 be signed by a govern-

ment director and that all shipments exceeding $13,000 be approved by the government. *Id.* at 666. The court also noted the inequity that would result in continuing to recognize the separate juridical status of the corporation and permitting the government to avoid the consequences of its expropriation while also allowing it to profit from the corporation's operations in the United States. *Id.* Plaintiff here has not presented any facts approaching the level of control deemed sufficient in *McKesson Corp.* and *Kalamazoo Spice.*

The facts presented here are also less compelling than those presented in various cases *rejecting* a finding of alter-ego status. For example, in *De Letelier,* the plaintiffs attempted to execute against the assets of Chile's government-owned airline in an attempt to satisfy a default judgment obtained against the Chilean government. 748 F.2d at 791. Despite a finding that the Chilean government directly controlled the airline's assets and facilities and used those facilities to carry out an assassination which was the subject of the default judgment, the Court of Appeals determined that the plaintiffs failed to overcome the *Bancec* presumption of corporate independence, noting that "[t]he evidence submitted by the judgment creditors does not reveal abuse of corporate form of the nature or degree that *Bancec* found sufficient to overcome the presumption of separate existence." *Id.* at 794–95.

Further, BCR's lack of involvement in the underlying transaction militates against piercing the corporate veil. In *Hercaire Int'l Inc. v. Argentina,* for example, the plaintiff obtained a judgment against Argentina for breach of contract, and the district court permitted the plaintiff to seize the assets of Argentina's government-owned airline to satisfy the judgment. 821 F.2d 559, 561 (11th Cir.1987). The court reversed the district court and

held that Argentina's full ownership of the airline's stock was insufficient to overcome the presumption of separate juridical existence. *Id.* at 565, The court further held that, because the airline "had no connection whatsoever with the underlying transaction which gives rise to Argentina's liability, it would be manifestly unfair to subject [the airline's] assets to such attachment." *Id.*

Based on the evidence presented, it appears that BCR was structured as a typical government instrumentality and functioned accordingly. The facts presented here are analogous to those presented in *Hester Int'l.* 879 F.2d at 172. In *Hester Int'l*, the plaintiff obtained a breach of contract judgment against the Nigerian government by binding it to a contract entered into by a Nigerian corporation shown to be the government's agent. 879 F.2d at 172. After relieving the government from the judgment and granting a second trial, the court dismissed the claim against the Nigerian government for lack of subject matter jurisdiction. *Id.* On appeal, the Fifth Circuit affirmed the dismissal on the ground that the plaintiff failed to establish an agency relationship between the corporation and the government. *Id.* at 176. According to the court, although the evidence demonstrated that the government "may have had a general supervisory role over the [corporation], [it] do[es] not demonstrate that the Federal Government was involved in the day-to-day management" of the corporation with regard to the transaction at issue. *Id.* at 181. That the government owned the entire corporation and appointed the Board of Directors was held to be insufficient to justify the disregard of the separateness of the juridical entities. *Id.* Rather, the court concluded that the corporation "was demonstrated to possess most of the characteristics of what *Bancec* described as the typical government instrumentality." *Id.* (internal quotation marks omitted). The

facts presented here mandate the same conclusion.

### C. *Plaintiff has failed to offer a sufficient equitable basis for disregarding the corporate form*

■ Even in the absence of daily control, the corporate form may be disregarded if necessary to prevent fraud or injustice. Plaintiff has failed, however, to persuade the Court that the equities in this case weigh in favor of piercing the corporate veil. Although Plaintiff has been wrongfully denied recovery on its judgment, there has been no showing that the corporate form of RBFT or BCR was used by the Romanian government to avoid payment and, as Plaintiff admits, neither BCR nor RBFT had any involvement in the transactions giving rise to this case. In other words, no evidence has been presented that the Romanian government abused the corporate form of either RBFT or BCR. *See, e.g., Minpeco*, 686 F.Supp. at 436–37 ("[I]t is undisputed that Peru never violated Minpeco's articles of incorporation or by-laws and that Minpeco was not created or used by the Peruvian government to perpetrate a fraud.").

In *EM Ltd.*, for example, the plaintiff bond holders sought to attach the assets of the Central Bank of Argentina ("BCRA") held in the Federal Reserve Bank of New York to satisfy a judgment obtained against the Republic of Argentina for its default on its bond indebtedness. 720 F.Supp.2d at 298–99, 2010 WL 1404119, at *27. The plaintiffs sought to attach BCRA's assets on the ground that it was an alter-ego of the Republic. *Id.* In granting the plaintiffs' motion, the court noted that, although "[the] Republic [of Argentina] did not manage the day-to-day operations of BCRA, ... there were certain larger, non-regular monetary operations which BCRA carried out at the behest of the Republic in order to serve the Repub-

lic's (not BCRA's) political and economic purposes." *Id.* The Court found that the Republic used BCRA funds to pay a debt to the International Monetary Fund owed by the Republic, "demonstrat[ing] that the Republic could draw on the resources of BCRA at will.... The Republic's control in this regard was complete." *Id.* at 300, at *28. The court went on to note the inequity produced by the Republic's use of BCRA funds to pay billions of dollars in Republic debt, while "[a]t the same time ... refus[ing] to pay the bond indebtedness which it [did] not wish to pay, and ... not honor[ing] its obligations to pay the judgments duly entered in the court." *Id.* at 302, at *30. The court concluded that the "assurances in the bonds guaranteeing legal channels to judgments which 'may be enforced' in the event of defaults were illusory," and, therefore, "[t]he circumstances of the present case are clearly those of fraud and injustice." *Id.* at 300–01, at *29.

Here, unlike the situation presented in *EM Ltd.,* not only is there no evidence of daily control, but there is also no evidence that either BCR or RBFT ever carried out any transactions at the government's behest or for the government's benefit. There has also been no evidence presented regarding comingling of funds between the government and BCR. In other words, no evidence has been presented that the Ro-

manian government abused the corporate form for its own benefit while wrongfully avoiding liability stemming from its actions. Further, unlike the Cuban government in *Bancec,* neither BCR, RBFT, nor the Romanian government is attempting to use the United States judicial system to recover on a claim while simultaneously attempting to avoid being the subject of an adversary proceeding. 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Plaintiff has thus failed to demonstrate that to recognize the corporate form of RBFT and BCR would sanction a fraud or injustice. Absent such a showing of fraud or injustice, the evidence of government control that Plaintiff offers is particularly inadequate. *See Minpeco,* 686 F.Supp. at 437 ("Although defendants have pointed to evidence giving rise to the reasonable inference that Minpeco and Peru have a close relationship and that their interests are aligned, these features typify the relationship between *all* government instrumentalities.... Such evidence, particularly in the absence of abuse, fraud or injustice, is legally insufficient ....").

As "both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness," *Letelier,* 748 F.2d at 795, this Court would not be warranted in disregarding the separate juridical identities of RBFT and BCR based on the evidence presented.[9] While

---

**9.** Despite the denial of Plaintiff's motion for a writ of execution, nothing in this order prevents Plaintiff from pursuing post-judgment discovery in accordance with the Federal Rules of Civil Procedure and New York law. *See, e.g., D'Avenza S.p.A. In Bankruptcy v. Garrick & Co.,* No. 96 CIV. 0166(DLC)(KNF), 1998 WL 13844, at *3 (S.D.N.Y. Jan. 15, 1998) (holding that, under New York law, a plaintiff "is entitled to examine third parties to determine if a judgment debtor has concealed or transferred assets applicable to satisfying its judgment.") Fed.R.Civ.P. 69(b) ("[In] aid of the judgment or execution, the judgment creditor ... may obtain discovery

from *any person*—including the judgment debtor-as provided in these rules ....") (emphasis added); *United States v. Conces,* 507 F.3d 1028, 1040 (6th Cir.2007) ("[T]he courts have confirmed that the scope of post-judgment discovery is very broad."); *F.D.I.C. v. LeGrand,* 43 F.3d 163, 172 (5th Cir.1995) (same); *Magnaleasing, Inc. v. Staten Island Mall,* 76 F.R.D. 559, 562 (S.D.N.Y.1977) (holding that, while "disclosure concerning the assets of a non-party is generally not contemplated by Rule 69(a) ... [t]his rule ... is not to be applied mechanically."). BCR and Erste are *not,* however, required to disclose information regarding their own assets. *See*

the Romanian government's refusal to pay its debts is deplorable, that fact alone does not allow this Court to permit Plaintiff to collect its judgment by any means available. By attaching the assets of BCR or Erste, the Romanian government may very well be compelled at last to satisfy its obligations due to the indemnification agreement entered into in connection with the sale of BCR. This does not, however, permit this Court to do so without a sound legal basis.

### Conclusion

For the foregoing reasons, Plaintiff's motion to issue a writ of execution and restraining notice against RBFT, BCR and Erste is DENIED.

SO ORDERED.

*Costomar Shipping Co., Ltd. v. Kim–Sail, Ltd.,* No. 95 CIV. 3349(KTD), 1995 WL 736907, at *3 (S.D.N.Y. Dec. 12, 1995) ("[Non-parties] cannot be required to disclose their own assets.").